THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NORBERT JONES *et al.*, Defendants-Appellants.

(No. 70-198;

Fifth District—July 19, 1972.

John O. Vogel, of Glen Ellyn, and Earle McCaskill, of East St. Louis, (Paul David Kelly, Legal Researcher, of counsel,) for appellants.

Robert H. Rich, State's Attorney, of Belleville, for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

The defendants, Wilford Jones and Norbert Jones, were both charged with Rape and Aggravated Kidnapping. The jury entered a general verdict of guilty against both defendants and the court sentenced both defendants to a term of not less than fifty, nor more than one hundred years. Both defendants appeal, claiming numerous errors, each of which is considered.

■■ Both defendants argue initially that the evidence does not establish their guilt beyond a reasonable doubt. "Because of the nature of the crime, reviewing courts are charged with an extraordinarily high standard of care in examining the evidence in a rape case." *People v. Brown* (1968), 99 Ill.App.2d 281, 241 N.E.2d 653. Therefore a review of the testimony is necessary.

Giselle Jines, a thirteen year old prosecutrix testified that at about five minutes after ten o'clock P.M. she was on her way home with her seven year old sister, when a gold Oldsmobile, with four colored men stopped near her. The man in the passenger side of the front seat got out and the man in the rear seat behind the front passenger seat got out and they asked her for money. There was a streetlight near the place where the car stopped and she saw the two men. She didn't get a good look at the man in the front seat but it was "maybe" Wilford Jones. Norbert Jones was the man in the back seat who got out of the car. She later stated positively that Wilford Jones was in the front seat. Wilford Jones was wearing a green jersey, but she could not identify a jersey shown to her at trial. She identified a tan safari jacket as that

worn by Norbert Jones. The men got back into the car and left. After she rounded the corner, the car pulled up again. She told her sister to run and two men grabbed her and put her in the back seat. She was screaming all the time. They took her to a house, where the four men and another man, who was in the house, had intercourse with her. She did not remember who had intercourse with her first or last, but she was sure that all five participated. After she had been released, a black woman picked her up and drove her home, but she didn't say anything about the occurrence to her. After arriving home, the police arrived and she showed them the house were the offense had occurred. Then she was taken to the hospital. Subsequently, at a line up, she was not able to identify the defendants at first, but after sitting and looking at the five men in the line up she identified the defendants.

Officer Henderson testified that, while visiting a friend, he observed two white girls walking on the sidewalk. He heard a screech of brakes and saw three men get out of an Oldsmobile and walk up to the girls. Finding the situation suspicious, he went to his car and got a shotgun. As he started across the street, they ran back to the car and drove off. They passed within four feet of where Henderson was standing. He recognized the driver of the car as Wilford Jones. Subsequently he identified Wilford Jones at a line up.

There was testimony by the examining physician at the hospital that the prosecutrix had been penetrated, and that his findings would not be consistent with a normal type of intercourse. Furthermore, a vaginal smear showed the presence of gonorrhea germs. There was also testimony that some of the prosecutrix's clothing and the couch on which the acts had occurred revealed the presence of blood and/or seminal fluid.

Officer Russell testified that he received a call at 10:30 P.M. to go to the Jines residence. After talking to the prosecutrix, she agreed to try to locate the house where the offense had occurred prior to going to the hospital. She found the house, which was later identified as having belonged to Helen Moore, Wilford Jones' mother. After taking the prosecutrix to the hospital, he returned to search the house. He found a wine bottle and coke bottle on the kitchen table. Later testimony showed the wine bottle to contain a finger print which matched the left hand index finger of Wilford Jones. He testified about a conversation he had had with Wilford Jones during which Wilford admitted that he had a sexual problem. Officer Russell stated that a Clarence Moore, who had been implicated in the offense, was living with Norbert Jones. The gold Oldsmobile belonged to Clarence Moore. He identified the safari jacket

as the one which Norbert Jones was wearing at the time of his arrest. Also he identified the jersey as the one which Wilford Jones was wearing when he came to the police station.

Anthony Robinson testified that at about 9:00 to 9:30 P.M. on the evening of the alleged offense he received a ride in a gold Oldsmobile in which Clarence Moore and Norbert and Wilford Jones were riding. Wilford Jones was sitting in the passenger's side of the front seat and Norbert was in the back seat. Moore was driving. He also identified the safari jacket as the one worn by Norbert Jones. After they dropped him off, he went to his sister's house. At about 10:30 he saw the Oldsmobile in front of the house where the offense had taken place, and he saw some men come out of the house, but they didn't look like Norbert and Wilford Jones. He was a friend of both defendants.

Lisa Jines, the prosecutrix's seven year old sister, testified that a car stopped and asked Giselle if she had any money. The car left and then stopped and they took Giselle. She identified one of the defendants, but the record does not specify which defendant. She had overheard a conversation between Giselle and her mother and she knew that Giselle had identified two men. She also knew that the two men pointed out would be in the court room.

Both defendants testified. Norbert Jones testified that he had met Clarence Moore while he was in the armed forces. On the day of the alleged offense, he had gone to fill out a work application in the morning. After returning home, he left again with Moore at about 2:30 or 3:00 and went to a club for some drinks. They stayed there until five or six or seven, when they went to eat in a chop suey place. He then came home about 8:30 P.M. with Clarence and a girl named Cora whom he had met at the club. He identified the safari jacket as his and the jersey as Wilford's. He met Wilford while near the chop suey place and they all drove to a washrack, where they picked up Robinson. Shortly thereafter, they dropped off both Wilford Jones and Robinson and drove to Norbert's house. After getting into the house, Norbert sat on the sofa and fell asleep. He did not leave the house until the next day. With regard to the line up, he stated that he had not been advised that he had a right to have a lawyer there. Also, he was number 1 in the line up and Wilford was number 3. He heard a girl's voice saying that she couldn't identify who it was and also another voice saying look at number 1 and number 3. Both the prosecutrix and Officer Henderson had denied any such occurrence.

Wilford Jones testified that he had seen Norbert Jones and Clarence Moore at about 6:45 or 7:00 P.M. on the night of the alleged offense. No one else was in the car. They picked him up and drove to the wash-

rack, where they picked up Robinson. They dropped off Robinson and one block later dropped off Wilford, who was going to his girl friend's house. He stayed there until 8:00 P.M. and got a ride home from his brother-in-law. Wilford denied that he had a social disease and he denied the conversation with Officer Russell. He also denied wearing the jersey on the night in question. He testified that he arrived home about 8:15 or 8:30 P.M. and remained at home, going to bed at about 9:00 or 9:15 P.M. He also said that he had not been advised that he had a right to counsel at the line up. He reiterated what Norbert had said about the prosecutrix's identification.

On Norbert's behalf, his mother testified that she especially remembered that night because of his drunken spectacle in front of the other children. She testified that he had gone to sleep on the couch and had remained there until his sister came down to get him to go to bed. This testimony was substantiated by Norbert's sister and two brothers.

On Wilford's behalf, his mother, sister, brother, and a neighbor testified that he had returned home early in the evening and that he had not left home the rest of the night. His mother also testified that she had left the house where the alleged offense occurred approximately one month before the occurrence, that he had been wearing a black cashmere coat on that night, and that the jersey had been at the cleaners. His sister and brother testified that his brother-in-law had dropped off Wilford at the house.

Reverend Mathew Roberson testified that he lived next to the Jines family and that at about 9:00 or 9:30 on the night of the alleged occurrence, after returning home from visiting his wife at the hospital, he heard a commotion from the Jines residence. There were a bunch of white males and the girls were screaming and fighting. The males were fighting the girls. After one car left, some males pushed the prosecutrix into a beige car and sped away. She was hollering frightfully to her younger sister. He called the police, but no one came. He waited until about 11:30 when he went up and fell asleep.

Finally, James Harley testified on cross-examination that on the night of the alleged offense Clarence Moore and Norbert Jones came in to borrow some money at about 9:00 or 9:30 P.M. while he was at the washrack.

■■ While it is true that we must exercise a high degree of care in examining the evidence, a "court of review will not reverse a judgment of conviction unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt as to the defendant's guilt". (*People v. Richards* (1970), 120 Ill.App.2d 313, 256 N.E.2d 475.) Furthermore, "[I]t is the

function of the jury to weigh testimony, judge the credibility of witnesses and determine the factual matters in debatable sets of circumstances". (*People v. Nicholls* (1969), 42 Ill.2d 91, 245 N.E.2d 771.) The evidence in this case is contradictory. There does not appear to be any real question that the rape occurred. Rather, the difficult question is whether there was sufficient evidence from which the jury could properly find that the defendants were the persons who committed the offenses.

■■ The jury had an opportunity to observe the witnesses as they testified. There was the testimony of the prosecutrix and her sister identifying the defendants and the gold Oldsmobile. Their testimony was corroborated by Officer Henderson, who saw the Oldsmobile and the defendant Wilford Jones. Their testimony was also corroborated to some extent by both Robinson and Harley, who placed the defendants in that car on the evening of the alleged offenses. While there was also contradictory testimony, an examination of the record discloses the circumstantial evidence to be of such weight as to lead to the jury's conclusion of guilt and their choosing to believe the prosecution witnesses. We cannot say that their decision was palpably contrary to the weight of the evidence. Our review of the record reveals that the finding of guilty was sufficiently supported by the evidence.

■■ Defendant Wilford Jones argues that reversible error was committed by not requiring the court reporter to transcribe the proceedings at the bench between Court and counsel. No objection was made, however, during the trial to the failure to transcribe. Furthermore, in *People v. Billingsley* (1968), 97 Ill.App.2d 54, 239 N.E.2d 475, the court considered the defendant's argument that the trial court had erred in not transcribing verbatim its admonition on a guilty plea. In that case, the defendant did not argue that he hadn't understood the admonition given. The court held that, where the record shows the defendant was at all critical times represented by an attorney and where the record shows no objection by counsel to the failure to transcribe the proceedings verbatim, the court would not require a verbatim transcript in the absence of a showing of any disability to the defendant. The defendant in the present case claims that the failure to transcribe the proceedings at the bench has handicapped him since he can't determine why the court ruled as it did on objections raised during the trial and that he is being denied effective appellate review thereby. In light of the facts that no objection was made to the failure to transcribe, that the defendant has failed to reveal any authorities for requiring a verbatim transcript, that the defendant failed to allege that any of the trial court's rulings following the unrecorded proceedings were erroneous, we do not find that the

trial court erred in failing to require transcription of the proceedings between court and counsel.

■■ The next issue raised by Wilford Jones is that improper cross-examination of a defense witness constituted prejudicial error. James Harley testified that he had been arrested and charged with the crime for which the defendants were on trial. The defense's theory in calling Harley seems to have been to suggest that, as in Harley's case, the police had charged the wrong man. However, in cross-examination, the following exchange took place:

"Q: Are you on trial for this crime?

A: I don't know.

Q: Why, no, you are not. They must have checked out your alibi and found out you didn't have anything to do with it and you were released, isn't that right?"

No objection was made to the State's Attorney's statement by the defense. However, the defendant argues that the statement inferred to the jury that Wilford Jones was guilty because he had not been released and was on trial and that his alibi had been checked out and had been found to be unsubstantiated, since he had not been released.

■■ The control of the ambit of cross-examination is within the discretion of the trial court and, unless there is a clear abuse of discretion, resulting in manifest prejudice to the defendant, there is no reversible error. (*People v. Halteman* (1957), 10 Ill.2d 74, 139 N.E.2d 286.) Furthermore, even though the defendant failed to object below, plain errors or defects affecting substantial rights may be noticed by this court. Supreme Court Rule 615, Ill. Rev. Stat., ch. 110A, sec. 615 (a).

However, in light of the purposes for which James Harley was called, the scope of the cross-examination was proper. While there may be some objection to the manner in which the State's Attorney framed his question, it was not so prejudicial as to require reversal.

■■ Wilford Jones next argues that portions of the testimony of Officer Charles Russell on direct examination were prejudicial:

"Q: Now then did you then have a discussion with either Wilford Jones or Norbert Jones to determine whether or not either one of those individuals had a social disease at the time?

MR. HOBAN: Object. It is immaterial.

BY THE COURT: Overruled.

A: At the time of arrest and after the subjects had been advised of their rights, I am talking about Wilford and Norbert Jones had been advised of their rights, and talking to them privately, I was told by Wilford Jones that he did have some problem, sex problem. We had asked these questions in general discussion to try to help the victim,

if at all possible. That was our motive, not to try to get them to incriminate themselves. Wilford Jones told me he had contacted some form of disease while in Asia, and that he referred to it as a hair cut or hair cuts, and in further describing this disease, he told me that the head of his penis was almost dissected from the rest of his personal part.

He argues initially that this testimony "can only be interpreted" that Wilford Jones was guilty but refused to make an incriminating statement and he cites *People v. Rothe* (1934), 358 Ill. 52, 192 N.E. 777, and *Rodrigues-Sandoval v. U.S.* (1st Cir. 1969), 409 F.2d 529, for the principles that it is improper for the prosecution to comment or for a police officer to testify about a defendant's refusal to make a statement. However, the testimony of Officer Russell indicates that the defendant did make a statement. There is no implication that the defendant was guilty or that he refused to make an incriminating statement. Hence, the testimony was not prejudicial, especially since no further comment was made about the testimony during the trial.

■■■ He also argues that the testimony was immaterial and served only to inflame the jury. The court had sustained an objection to that part of the testimony which described the physical condition of the defendant, but allowed the admission that he had some problem. The court also instructed the jury to disregard the statement. However, Dr. Wilson West, who examined the prosecutrix after the alleged crime, testified that a vaginal smear taken showed gonorrheal germs. In light of this testimony, the testimony of Officer Russell would be material. While it is true that, in the trial of sex offenses, extreme care is demanded to prevent prejudicial material which might deprive the defendant of a fair trial, (*People v. Garreau* (1963), 27 Ill.2d 388, 189 N.E.2d 287, it would not appear that the detailed description of the defendant's physical condition was so prejudicial as to require reversal.

■■ Wilford Jones next argues that reversible error was committed by the jury's bringing in a general verdict, since the verdict does not inform him of the offense of which he was convicted and restricts his appellate review. However, in *People v. Lymore* (1962), 25 Ill.2d 305, 185 N.E.2d 158, *cert. den.* 372 U.S. 947, our Supreme Court held, at 159:

"A general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable * * *. This court has also held that in a case where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be

inflicted for the offense charged in any one or more of the counts, the verdict must be sustained." That case involved an indictment charging burglary and receiving stolen goods. A similar statement appears in *People v. Shannon* (1968), 94 Ill. App.2d 110, 236 N.E.2d 369, involving two counts of murder.

Furthermore, the record indicates the Forms of Verdict were given without objection. In *People v. Green* (1963), 27 Ill.2d 39, 187 N.E.2d 708, the Court held, at 710, that the defendant could not complain of an alleged error in submitting a general verdict when the "defendant did not object to the form of verdict given to the jury nor did he submit any other form". The defendant in that case was charged in three counts with selling, possessing, and dispensing narcotic drugs.

In light of these authorities, we find that there was no error in the use of the general verdict for an indictment charging rape and kidnapping.

■■ Wilford Jones also argues that the trial court erred in giving the forms of verdict instruction to the jury, which included the statements "Your agreement upon a verdict must be unanimous * * *. When you have unanimously agreed upon the verdicts you will select the forms which reflect your verdicts and sign them as I have stated." He argues that the instruction clearly eliminated the possibility of a "hung jury", and that, if a juror was of the opinion that a defendant was not guilty and all the other jurors were of the opinion he was guilty, the instruction implied that the juror could not state or vote that the defendant was not guilty unless the other jurors changed their verdict to not guilty. The "forms of verdict" instruction given was IPI Criminal No. 26.01 and it was given without objection.

■■ Supreme Court Rule 451, Ill. Rev. Stat., ch. 110A, sec. 451 (a) provides that an "IPI-Criminal instruction shall be used, unless the court determines that it does not accurately state the law". Even though there is general authority that a failure to object and to tender an instruction precludes a defendant from complaining of an error, (*People v. Green* (1963), 27 Ill.2d 39, 187 N.E.2d 708), Supreme Court Rule 451 (a) provides that "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require".

In reviewing the forms of verdict instruction which was given, we do not find the language was misleading or erroneous, as alleged by the defendant.

■■ The defendant Wilford Jones also argues that the trial court erred in refusing to give the tendered instruction on the defense of alibi. Our Supreme Court recently considered this issue and held that "[I]t

was error for the trial court to refuse to give the defendant's two instructions on the subject of alibi", relying in part on the recommendation in IPI-Criminal 24.05 that no instruction on alibi was given. *People v. Poe* (1971), 48 Ill.2d 506, 272 N.E.2d 28.

■■ Wilford Jones also argues that the trial court failed to give adequate instructions on the elements of the offenses charged. The defense made no objections to the instructions given and did not tender additional instructions on the elements of the offenses. The trial court gave IPI-Criminal No. 9.01, providing that "A male person of the age of fourteen years or older who has sexual intercourse with a female, not his wife, by force and against her will, commits the crime of Rape"; IPI-Criminal No. 9.02, providing "When I use the words 'by force and against her will', I mean that under the circumstances the female did not voluntarily consent to sexual intercourse"; IPI-Criminal No. 8.01, providing "A person commits the crime of kidnapping who knowingly and by force, or by threat of imminent force, carries another person from one place to another with intent secretly to confine that person against his will"; IPI-Criminal No. 8.04, providing "A person who kidnaps another commits the crime of aggravated kidnapping when he inflicts great bodily harm or commits a felony upon the victim"; and IPI-Criminal No. 4.04, providing that the crime of Rape is a felony.

He argues that the trial court erred in allowing the jury to retire for its deliberations insufficiently instructed on the law and free to improvise its own concepts of the crimes charged, citing *People v. Davis* (1966), 74 Ill.App.2d 450, 221 N.E.2d 63, in which the court held that an instruction consisting merely of the statutory definition of attempt was so inadequate as to require a new trial, even though the defendant had not requested additional instructions. In that case, however, the defendant was charged with an attempt to commit robbery. The instruction given provided merely that a person commits an attempt "[W]hen, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense". No further instructions were given to define the "specific offense" to which the attempt pertained.

The present case does not involve the same degree of omission as that in the *Davis* case. The jury was instructed on both charges. The language of the instructions did not include the vague, undefined terms involved in the *Davis* case.

In *People v. Fryman* (1964), 4 Ill.2d 224, 122 N.E.2d 573, our Supreme Court reversed the convictions of two defendants charged with rape. In that case, after giving instructions in the language of the statute, the trial court refused the defendants' tendered instructions dealing with

the effect of consent or want of consent. Emphasizing that a defendant is entitled to have the jury instructed as to any state of facts which the jury might legitimately find from the evidence to have been proved, the court noted that the primary defense of one of the defendants was consent of the prosecutrix and held that the trial court erred in refusing the tendered instruction.

■■ In this case, the defendants did not tender additional instructions. While it might have been better for the court to have instructed more specifically on the elements of the offenses charged, we do not find that the failure of the trial court so to instruct was prejudicial error. "Where the instructions, as a whole, inform the jury of the facts which are essential to the proof of the commission of a specific crime, an error in giving an instruction will not be considered so prejudicial as to warrant a reversal. *People v. Hyde* (1971), 1 Ill.App.3d 831, 275 N.E.2d 239.

Wilford Jones next argues that he was placed in double jeopardy when he was tried, convicted, and sentenced for both aggravated kidnapping and rape because both crimes arose out of the same conduct or transaction. He cites *People v. Green* (1970), 130 Ill.App.2d 609, 265 N.E.2d 184, holding that the trial court erred in entering judgment on counts charging attempt to commit indecent liberties and committing indecent liberties with a child, when the charges pertain to the same conduct, and *People v. Thomas* (1970), 130 Ill.App.2d 1107, 266 N.E.2d 721, holding that the offenses of rape and deviate sexual assaults necessarily include the lesser offenses of indecent liberties and that the convictions and sentences on the indecent liberties should not have been imposed.

■■ The defendant argues that the aggravated kidnapping and rape charges resulted from the same conduct, as did the aggravated battery and rape charges in *People v. Weaver* (1968), 93 Ill.App.2d 311, 236 N.E.2d 362. However, as the court held in the *Weaver* case, "[W]hile we agree with the principle that two punishments cannot be imposed for a single act, the State is not restricted to one punishment when the acts are separate and distinct". The Court then considered whether rape and burglary were separate and distinct offenses arising from the same course of conduct or from two separate and distinct acts and concluded that they arose from separate and distinct acts.

Furthermore, in *People v. Johnson* (1970), 44 Ill.2d 463, 256 N.E.2d 343, *cert. den.* 400 U.S. 958, our Supreme Court answered defendant's claim "that the words 'same conduct' and 'same act' should be given the broad definition of 'same general transaction'", by holding at 350:

"However proper the application of the above statutory provisions may be in cases which would involve double punishment for the same conduct where the same identical evidence is the basis for the finding

of guilty of both charges, we believe they were not intended to cover situations in which more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof."

In that case the Court found that crimes of rape and burglary were separate and distinct crimes requiring different proof to sustain them. ██ Similarly, in the present case, the offenses of aggravated kidnapping and rape are separate and distinct crimes and required different elements of proof. That the kidnapping would be aggravated due to the commission of the rape would not render them the same for prosecution. ██ Furthermore, as discussed earlier, the jury returned a general verdict of guilty. The defendants were not sentenced separately on each count. As stated in *People v. Lymore* (1962), 25 Ill.2d 305, 185 N.E.2d 158, *cert. den.* 372 U.S. 947, at 159:

"This Court has also held that in a case where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained."

Accordingly, we find no merit in the defendant's argument.

██ Wilford Jones next argues that the trial court improperly allowed Officer Henderson to testify that the prosecutrix identified Wilford Jones in the lineup and improperly allowed the prosecutrix to testify that Officer Henderson identified Wilford Jones in the lineup. The record does not show that the prosecutrix at any time testified that Officer Henderson identified Wilford Jones at the lineup. There is only testimony that three officers were present. Furthermore, on cross-examination of Officer Henderson, after ascertaining that he had identified Wilford Jones, the defense asked Officer Henderson: "After you made that statement, did the complaining witness, the girl, Giselle Jines, did she then identify Wilford Jones? It was after you had identified him?" And he responded "Yes, sir".

This testimony was properly received, since the defense had tried to establish that the prosecutrix did not initially identify Wilford Jones and that only after someone suggested that she look at 1 and 3 did she identify the defendants. Furthermore, the defense seemed to be suggesting in the question, that Officer Henderson made his identification in such a way that the prosecutrix could hear, since Officer Henderson on cross-examination stated: "I didn't say it out loud. I called him over to the other side of the room from Giselle".

The cases which the defendant has cited have generally involved

situations in which, under examination by the prosecution and usually over objections by the defense, a witness testifies that another person identified the accused. This is not the situation in the present case. We do not find the testimony of Officer Henderson to be objectionable.

■■ The defendant Norbert Jones argues that the pre-trial identification lineup used in this case was so unnecessarily suggestive and conducive to mistaken identity as to deny the defendant due process of law. This argument is premised on the truth of the assertions of both Norbert Jones and Wilford Jones that the prosecutrix was unable to identify them initially and only after she was told to look at numbers 1 and 3 did she make an identification. The prosecutrix testified that no one suggested that she look at any particular numbers, but that they only asked her to tell them the numbers she recognized. Officer Henderson was also present at the lineup and he testified that no one made any suggestions to the prosecutrix. He also testified that, in order to eliminate the possibility that the prosecutrix might overhear his identification, he called the officer conducting the lineup over to the other side of the room so that she would not hear. The defendants do not argue that any other aspects of the lineup were unnecessarily suggestive. There were five men in the lineup; all were black; and all generally fit the descriptions provided by the prosecutrix.

The cases cited by the defendant, *People v. Blumenshine* (1969), 42 Ill.2d 508, 250 N.E.2d 152 and *Stovall v. Denno* (1967), 388 U.S. 293, involved clear examples of overly suggestive lineup procedures. This case does not involve such a clear example. Viewed through the prosecution witnesses, there was nothing improper about the lineup. If defendants were believed, it was suggestive. Defense counsel chose to wait until the defense case to question the lineup identifications. As with the other contradictions in testimony, this conflict of evidence was presented to the jury to resolve and the jury resolved the conflicts against the defendants.

Both defendants also argue that they were not adequately represented by their trial counsel and they cite numerous examples of what they term "incompetence", including the failure to object to Officer Russell's testimony as to a pre-trial admission by Wilford Jones about a social disease without establishing that Wilford Jones was properly advised of his rights, the failure to object to the pre-trial lineup identifications, and the failure to introduce evidence that the defendants were free from social diseases.

■■ Our Supreme Court, in *People v. Harper* (1969), 43 Ill.2d 368, 253 N.E.2d 451, declared:

"Before a conclusion of inadequate representation can be reached,

the defendant must demonstrate the actual incompetence of counsel as reflected by the manner of carrying out his duties as a trial attorney and it must further appear that substantial prejudice results therefrom, with which the outcome would probably have been different."

Similarly, in *People v. Johnson* (1970), 45 Ill.2d 501, 259 N.E.2d 796, the Court rejected inadequacy of counsel arguments based on failure to object to an in-court identification following a lineup which was held without counsel. The Court stated that since the procedure was not fundamentally unfair, no objection existed.

The defendants cite *United States v. Hammonds* (D.C. Cir. 1970), 425 F.2d 597, which held that the totality of omissions and errors, and particularly futile closing argument, reflected a *pro forma* defense and a lack of adequate representation in preparation and trial of the case. The court emphasized, however, that errors of judgment on trial tactics are not to be evaluated in determining whether counsel was so inadequate as to deprive the defendant of a fair trial.

■■ We have reviewed the allegations in the present case and conclude that the defendants were not so inadequately represented as to constitute substantial prejudice without which the outcome would probably have been different.

■■ Norbert Jones argues that he was denied due process by being compelled to participate in a pre-trial identification lineup without being advised of a right to have counsel present. Both defendants testified that they were not advised that they had a right to have a lawyer present at the lineup. Hoewver, since this case involves a pre-indictment lineup, the argument must be rejected under the authority of *People v. Palmer* (1969), 41 Ill.2d 571, 244 N.E.2d 173; *People v. Hardin* (1971), 2 Ill. App.3d 348, 276 N.E.2d 384 and the most recent case of *Kirby v. Illinois* (U.S. Supreme Court Cause No. 70-5061, 40 United States Law Week 4607).

Finally, both defendants argue that a sentence of imprisonment for a term of not less than fifty nor more than one hundred years is excessive. We agree. Hearing in mitigation and aggravation was waived.

■■ Ch. 38, sec. 11—1(c), Ill. Rev. Stat. 1969 provides for an indeterminate term with a minimum of not less than four years for rape; ch. 38, sec. 10—2(b), Ill. Rev. Stat. 1969 provides for imprisonment in the penitentiary for an indeterminate term with a minimum of not less than two years for aggravated kidnapping. Both indicate a wide discretion in the imposition of sentence. However, the effect of the sentence imposed is to only make it possible for defendants to be *eligible* for parole after serving 20 years less time credit for good behavior. (See ch.

108, sec. 204(g) and ch. 38, sec. 123—2(a)(2) and (a)(3) Ill. Rev. Stat. 1969.) While severe circumstances of aggravation are shown by the record, it is also referred to for circumstances of mitigation.

Wilford was 20 years old when convicted, had finished high school, had a steady job with Hunter Packing Company and had been honorably discharged by a hardship discharge after serving two years and five months in the service, a part of which was spent in Viet Nam. He made his home with his mother who had a large family. Norbert was 22 years old when convicted, he resided with his mother and four other children; his father resided in Detroit. He was honorably discharged after serving four years. At the time of the crime he was unemployed, although he had previously been employed by Hunter Packing Company. The two defendants were apparently unrelated but had been acquainted with each other approximately 13 years. The court was advised by the prosecutor that neither of defendants had a prior criminal record.

■■ From these facts and circumstances, it cannot be assumed that rehabilitation is not a possibility; the nature of the crimes and the fact that there is no evidence of their being armed, while still of a serious nature, does not indicate that the best interests of society or of the defendants would be served by foreclosing them from the possibility of rehabilitation by being considered for parole before serving 20 years, less time for good behavior. The parole authorities should be given an opportunity to consider their possibilities of rehabilitation at a time when rehabilitation is still possible and at a time and age when it may be possible for them to "make it" outside the walls of an institution.

■■ As the Court stated in *People v. Jones*, 235 N.E.2d 379, 381:

"Advances in the fields of psychology, psychiatry and sociology have contributed to a greater understanding of the motives underlying the commission of criminal offenses, and the techniques and methods which are of value in the rehabilitation programs provided in modern penal institutions. Excessive minimum sentences, imposed by the courts, may defeat the effectiveness of the parole system by making mandatory the incarceration of a prisoner long after effective rehabilitation has been accomplished."

Additionally, the Court adopted the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures, saying:

"In order to preserve the principle of indeterminacy, the court should not be authorized to impose a minimum sentence which exceeds one-third of the maximum sentence actually imposed."

■■ We therefore affirm the judgment of conviction and modify the

sentence of each, reducing the minimum sentence of each defendant to eight years and the maximum of each defendant to 25 years.

Judgment affirmed as modified.

G. MORAN and JONES, JJ., concur.