THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SYLVESTER HENDERSON *et al.*, Defendants-Appellants.

First District (2nd Division) No. 58786

Opinion filed February 26, 1976.

358

Werner E. Scholtz, of Chicago, for appellant James Sims.

Paul Bradley and Robert E. Davison, both of State Appellate Defender's Office, of Chicago, for appellant Sylvester Henderson.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Raymond Prosser, Larry L. Thompson, and Scott Mayer, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendants, Sylvester Henderson and James Sims, were each charged with the crimes of aggravated kidnapping (Ill. Rev. Stat. 1971, ch. 38, par. 10—2), rape (Ill. Rev. Stat. 1971, ch. 38, par. 11—1), deviate sexual assault (Ill. Rev. Stat. 1971, ch. 38, par. 11—3), and two counts of armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 18—2). Defendants were tried by a jury and found guilty of aggravated kidnapping, rape, and both counts of armed robbery, but not guilty of deviate sexual assault. Both were given consecutive sentences of 15 to 45 years for the aggravated kidnapping, 20 to 60 years for the rape, 15 to 45 years for

one count of armed robbery, and 10 to 30 years for the other count of armed robbery. Defendants now appeal. A summary of the evidence follows:

The complainant testified that, on December 4, 1971, she returned to her apartment at approximately 8 p.m. She had parked her car and was carrying two packages of "sample diapers," her purse, and other packages. As she was walking from her car, she felt someone pulling the purse off her arm and turned to face a man who put a gun to her head and ordered her to another car parked in the garage. The garage was illuminated by lights in the garage itself and street lights in the adjacent alley.

The complainant was ordered into the backseat of the car and, at that time, she observed another individual in the driver's seat. As she entered the car, she initially saw his profile, and at that moment, he turned around, affording her an opportunity to see part of his face. The victim, still carrying her packages, was pushed to the floor of the backseat, landing on her back. The non-driver entered the backseat, lying on his stomach and facing the victim, and held a gun to her head. Complainant later identified defendant Sims as the non-driver, and defendant Henderson as the driver.

The car was then started up, with all occupants still in the same position. After a brief interval, the victim heard the driver say a policeman was following the car. They continued on for a short distance when the driver said he had to urinate, stopped the car, and got out. The non-driver told her that if she said anything or looked, he would kill her. The non-driver kept looking out the back window when he suddenly jumped out of the car, stepping on the victim as he did so. The complainant then heard scuffling sounds and shouts saying, "Get him in the car, get him in the car." Although she was apparently only a few feet from a melee, the victim could not see what was taking place outside the vehicle. Nor did she notice any of her packages fall from the car.

The non-driver then returned to the car and resumed his position on his stomach in the backseat. The car started up and she heard conversation between the two men such as: "Get off the road; turn here; they've got your license number; can you make it." The non-driver also told her: "That copy [sic] was going to save your life but we took care of him." As they continued driving, all three remained in their original positions with the non-driver passing various items taken from the victim, including her purse, to the driver. At one point while they were driving, the complainant saw the non-driver get up and point his gun out the window.

After the initial stop, the victim and her two abductors drove for

approximately 20 more minutes. After stopping again, the non-driver led the victim into an abandoned apartment building. At this point, she did not know what happened to the driver. Once inside the building, the non-driver ordered her to undress. She complied except for her coat which she wore during the entire incident. The non-driver then held a gun to the victim's head and had intercourse with her during which she was able to see his face. She identified defendant Sims as her assailant. The second man now appeared and both led the victim to another room. At this time, she was unable to see the face of the second man because his back was turned to her, but she was able to observe that the second man was carrying a cane.

Once in the second room, the non-driver again had intercourse with the victim, and also forced her to perform acts of anal and oral copulation with him. The second man, whom she was now able to see and later identified as defendant Henderson, then had her perform all three acts with him. After this series of assaults, the complainant was told to dress and was led back to the car. She was pushed to the floor of the backseat and a vest, which would remain covering her eyes until she was released, was put over her head. One of the men entered the backseat and the car started up.

After a short time, the car stopped and the man in the backseat (she was unable to identify him because of the vest covering her eyes) told the victim to undress. She was then forced to have intercourse and perform acts of oral and anal copulation with that individual. Afterwards, she was allowed to dress and the car started up again. After a short distance, the car stopped again. Complainant was led from the car, and told, "Take the vest off of your head and don't turn around or I'll kill you."

The victim stopped a bus which then stopped a squad car. She was eventually taken to a hospital where the presence of sperm in her vagina indicated that she had had sexual relations within the last eight hours.

Officer Frank Jasch of the Chicago Police Department testified that, at approximately 8 p.m. on December 4, 1971, he observed a "'65 or '66 Pontiac" speeding and changing lanes on Lake Shore Drive. He was able to observe only one person, the driver, in the auto. He turned on his Mars light, and at one point, his siren, to pull the vehicle over.

After curbing the vehicle at approximately 1700 North Lake Shore Drive, Officer Jasch met the driver halfway between the two vehicles. Officer Jasch asked for and received the driver's license. For the next two or three minutes they discussed the violations and moved slowly toward the Pontiac. Officer Jasch recalled that the driver had a cast on

one leg and carried a cane. He identified defendant Henderson as the driver.

While at the rear of Henderson's vehicle, Officer Jasch wrote "DZ 6452, 7201 South Harvard, N. Carolina," on the back of Henderson's driver's license. As he finished writing the rear door of the car flew open and he observed a man in a prone position on the backseat of the car pointing a gun at him. This man said, "Don't move, or I'll kill you." The man got out of the car, put one hand around Jasch's throat, and put the gun to his head. As he got out of the car, Officer Jasch was able to observe his face and later identify him as defendant Sims. Although Jasch was very close to defendant's car, he did not see anyone else in the backseat.

Both defendants began moving Officer Jasch toward the police vehicle, and repeating, "Get him in the car, get him in the car." At this point, he felt his service revolver leave its holster and felt it placed in his side. The gun at his head was removed and a scuffle ensued. During the struggle, Officer Jasch was able to break away, run into the traffic on Lake Shore Drive, and hail a cab. He observed defendants' auto proceeding southbound on Lake Shore Drive.

Officer Jasch returned to the area of the fight and recovered a bag of diapers which he had seen fall out of defendants' vehicle. At trial, Officer Jasch identified a plastic bag of diapers as the same diapers he recovered that night. At trial, the victim also explained that the diapers were special test diapers not available on the market and, because of special design characteristics, she could identify the diapers as one of the packages she was carrying when she was abducted. Finally, Officer Jasch identified photos of defendant Henderson's car as the car he stopped the night of the armed robbery.

Mr. Julius Roth was driving southbound on Lake Shore Drive on December 4, 1971, some time after 8 p.m. At approximately 1700 North Lake Shore Drive, he noticed a police officer and two black males standing by the road next to a police car. As Mr. Roth approached, he saw the police officer "throw up his hands * * * and * * * run across * * * into the traffic." Mr. Roth later saw the same automobile that had been stopped next to the police car pull away from the side of the road and pass him. He saw two persons sitting in the car, one in the front and one in the back. When Mr. Roth attempted to move closer to that vehicle to "identify the persons in the car," the one in the back pointed a "shiny object" at him and he ceased pursuit. Mr. Roth testified that the car involved in this incident was "very similar" to two pictures of defendant Henderson's car.

At approximately 1:30 a.m. on December 6 ,1971, Police Officer Galich

was driving home in a private automobile with another police officer. At that time, he noticed a 1965 Pontiac with N. Carolina license plates which fitted the description of a vehicle listed as wanted in a police bulletin. They stopped and called for additional help and then followed the vehicle. As additional help arrived, the vehicle double parked and the sole occupant, the driver, exited the car and entered a tavern at 91st and Greenbay. As the driver walked to the tavern, Officer Galich noticed that the driver had a cast on his leg. The police bulletin that listed the vehicle also stated that one of the men connected with the wanted vehicle had a cast on his leg. About a minute later, that individual came out of the tavern and was arrested. Two of the items recovered during that arrest were a driver's license issued to defendant Henderson with "DZ 6452, 7201 South Harvard, N. Carolina," written on the back, and a bill of sale for that car listing Sylvester Henderson as the owner. Officer Galich identified defendant Henderson as the man he arrested early on December 6, 1971.

Miss Emma Jean Landfair testified that early on the morning of December 6, 1971, she was in a tavern at 91st and Greenbay. At that time defendant Henderson approached her and asked if she would do him a favor. After she agreed, Henderson handed Miss Landfair a loaded revolver. Henderson then left the tavern and Miss Landfair took the gun to her home. Later that same morning, the police came to her home and recovered the revolver. At trial, she identified the revolver as the one given her by defendant Henderson due to a name engraved on the side of the weapon. Officer Jasch easily identified the revolver as the one taken from him on the night of December 4 because his name and star number were engraved on its side.

During the morning of December 6, defendant Henderson was placed in a lineup with six other individuals and positively identified by Officer Jasch as the driver of the automobile he stopped on December 4. That same morning, defendant Henderson was placed in another lineup with three other individuals. In this second lineup, defendant Henderson was positively identified by the complainant as the man who had driven the car in which she was kidnapped and who had raped her on the evening of December 4.

Also on the morning of December 6, the complainant viewed eight or ten photographs. From that group, she selected a photo of defendant Sims as the second individual who had kidnapped and raped her. Subsequently on December 6, police procured an arrest warrant and two police officers repaired to the home of defendant Sims but were advised he was not on the premises. Defendant Sims subsequently surrendered

to the police on December 8. In the afternoon of December 8, he was placed in a lineup with four other individuals and positively identified by Officer Jasch as one of the individuals who stole his revolver on December 4.

In one indictment, defendants were charged with the crimes of aggravated kidnapping, rape, armed robbery, and deviate sexual assault of the complainant. In a separate indictment, defendants were charged with the armed robbery of Officer Jasch. The indictments were consolidated and the case tried before a jury. The first jury trial resulted in a mistrial. At a second jury trial, defendants presented a defense based primarily on discrepancies between the original statements of the State's witnesses and their trial testimony. Both defendants were found guilty by the jury of aggravated kidnapping, rape, and both counts of armed robbery, but not guilty of deviate sexual assault. Both were sentenced to consecutive terms of 15 to 45 years for aggravated kidnapping, 20 to 60 years for rape, 15 to 45 years for the armed robbery of complainant, and 10 to 30 years for the armed robbery of Officer Jasch. All sentences are to run consecutively. Defendants now appeal.

## I

■■ The first issue raised questions as to the sufficiency of the evidence to prove defendants guilty beyond a reasonable doubt. In particular, both defendants level a broad attack on the victim's in-court identification of them as her assailants.

Defendant Henderson argues that the victim had only a limited opportunity to observe him. He points to the victim's testimony that only twice during the entire episode, once in the car and once in the abandoned apartment building, was she able to observe defendant Henderson's face. Both defendants challenge the sufficiency of the lighting in the garage, in the car, and in the building. And both defendants rely on testimony by the victim that she lost her glasses when she was accosted in the garage. Although not with the same degree of specificity, both defendants also question the identification by Officer Jasch.

However, it is a well-settled rule of our criminal law that the identification testimony of a single witness, even if it be that of a crime victim, is sufficient to convict if the identification is positive and the witness is credible. (*People v. Clarke*, 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Smith*, 9 Ill. App. 3d 195, 292 N.E. 2d 128.) The mere fact that the victim did not have an extended opportunity to observe defendant Henderson is not, in itself, enough to vitiate her positive identification of Henderson as one of her assailants. (*People v. Smith*, 18 Ill. App.

3d 859, 310 N.E.2d 734.) The instant record evidences a more than adequate opportunity by both the victim and Officer Jasch to identify both defendants.

■■ Defendants' arguments concerning the lighting conditions and the loss of the victim's glasses are similarly without merit. The victim described the garage where she was able to observe both defendants as a "pretty well lit area." She was face to face with defendant Sims while traveling on Lake Shore Drive, a well-lit thoroughfare. And she was necessarily face to face with both defendants during the series of assaults in the building. Under such circumstances the lighting conditions were more than adequate and the loss of the victim's glasses insignificant. (*People v. Canale*, 52 Ill. 2d 107, 285 N.E.2d 133; *People v. Booth*, 20 Ill. App. 3d 88, 312 N.E.2d 736.) Needless to say, the lighting conditions for Officer Jasch's identification are beyond question.

In addition to the identification testimony, defendants characterize the State's testimony as a whole as unbelievable and on that basis also challenge the sufficiency of the evidence. Only a few of the many purported "improbabilities" relied on by defendants need be set out: although the victim claimed her purse was pulled from her arm when she was first approached in the garage, nothing else fell to the ground; although Sims allegedly stepped on the victim when leaving the car on Lake Shore Drive, no marks were found on the victim's stomach; although the abandoned building was described as glass and debris ridden and although ten sex acts allegedly occurred there, there were no marks or cuts on the victim's body; although the victim spent a considerable time in Henderson's car and although a rape allegedly occurred there, no fingerprints were introduced into evidence and no evidence of a rape in the car was found; defendants argue that it is physically impossible for two men to commit ten sexual acts within such a short period of time; and finally, defendants suggest that it is incredible that they would continue their crime spree and still be driving the same car two days later, after having been stopped and identified by the police.

We find nothing improbable about the victim's testimony that, although her purse was pulled from her arm by Sims, none of her other packages fell to the ground. The fact that one item was snatched from the victim does not require her to lose control of all her packages. Defendants make much of the fact that the victim did not have any marks or cuts following the incident. As for Sims stepping on the victim as he left the car on Lake Shore Drive, the record fails to reflect the severity or manner of this ungentlemanly like conduct. It is possible

for a person to step on a body without inflicting discernible trauma. Sims stepped on the victim; he did not stomp on her. As for the glass and debris ridden apartment building, defendants completely overlook the victim's testimony that she kept her coat on during her entire stay in the building. Regarding the lack of fingerprints in Henderson's car, the evidence technician testified that there were no "suitable fingerprints," a common enough finding after investigation of a crime scene. Although there was no evidence of a rape having been committed in the car, it must be remembered that two days elapsed between the alleged rape and the first opportunity the police had to examine the car. That is more than ample time in which to clean the interior of the car. Defendant's reliance on the medical evidence that it is impossible to commit ten sexual acts within such a short period of time is misplaced. Defendants' argument is premised on the assumption that defendants ejaculated during each act. That is an assumption not supported by the record and not required for a conviction of rape. Finally, while we agree that the State's evidence depicts two rather daring or foolish criminals, that, in itself, does not render the State's evidence unbelievable. The fact that defendants manifested a good deal of bravado in committing their atrocious crimes tells the jury more about defendants than about the veracity of the State's witnesses.

■■ In any event, all defendants' alleged improbabilities, whether real or imagined, were before the jury and were properly a matter for their consideration. (*People v. Kriston*, 12 Ill. App. 3d 18, 297 N.E.2d 206.) Minor discrepancies and inconsistencies in testimony do not render that testimony unworthy of belief, but go only to the weight to be given that testimony. (*People v. Hanna*, 42 Ill. 2d 323, 247 N.E.2d 610; *People v. Cooper*, 69 Ill. App. 2d 18, 216 N.E.2d 168.) After a review of all the testimony, we find nothing so improbable so as to raise a reasonable doubt as to defendants' guilt.

■■ Defendants also attack the sufficiency of the evidence regarding prior statements of the victim which they allege were inconsistent with her testimony at trial. Specifically, defendants note that, when interviewed at the hospital immediately after the incident, the victim told an investigating officer that when she was accosted in her garage, she had been approached from behind and told not to turn around. She also told that officer that she was kept on her stomach while in the car, not on her back. After the officer had interviewed the victim and Officer Jasch, the investigating officer "wasn't sure of anything." Defendants also point to the victim's testimony at the preliminary hearing concerning her ability to observe defendants while in the abandoned build-

ing. Defendants argue that all three statements are inconsistent with the victim's testimony at trial and thus render her trial testimony untrustworthy.

The victim's confusion immediately after the incident is easily explained by the fact that she had just undergone an obvious traumatic experience. Indeed, the investigating officer testified that she was "shaking like a leaf" and could hardly talk. As for her alleged inconsistent statement at the preliminary hearing, a complete and objective reading of the transcript of that proceeding reveals that her testimony there was substantially the same as at trial. In any event, such inconsistencies in testimony taken at different times are not unusual and go only to the weight to be given the testimony by the jury; they do not destroy the credibility of the witness. *People v. Bell*, 53 Ill. 2d 122, 290 N.E.2d 214; *People v. Gant*, 18 Ill. App. 3d 61, 309 N.E.2d 265.

■■ It is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or as to the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses. (*People v. Montgomery*, 19 Ill. App. 3d 206, 311 N.E.2d 361.) A reviewing court will not set aside a finding of guilty unless the evidence is so palpably contrary to the finding or so improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. (*People v. Beathea*, 24 Ill. App. 3d 460, 321 N.E.2d 458.) It would serve no purpose to reiterate the evidence which compels this court, like the jury, to find that the evidence overwhelmingly established defendants' guilt beyond a reasonable doubt.

## II

■■ Defendants challenge the pretrial identification procedures. They conclude that because of the allegedly prejudicial pretrial procedures, their in-court identification should have been suppressed.

Defendant Sims argues that there was a suggestive confrontation in the police station between himself and Officer Jasch prior to his lineup, and that the lineup, itself, which Officer Jasch viewed was suggestive. Sims also argues that the victim's in-court identification was tainted because of allegedly prejudicial use by the police of certain photographs.

Defendants add the additional issues of whether they were entitled to the presence of counsel at their preindictment lineups and photographic displays, and whether the trial court improperly denied them a second hearing on their motion to suppress identification testimony.

Prior to defendants' first trial, defendants' counsel filed a written motion to suppress the identification testimony of the victim and of

Officer Jasch. That written motion attacked both the makeup of the lineups and the fact that defendants did not have counsel present at those lineups. The testimony of defendants offered in support of those allegations showed only they did not have counsel during their lineups. Defendants' attorney then expressed a desire to call as witnesses both the victim and a policeman who allegedly showed her some photographs. Since the victim was not available that day and since the policeman had not yet been identified, the hearing was recessed until the next day. The next day defendants' counsel stated that sufficient testimony had been presented to show the absence of counsel at defendants' lineups. Based on that alleged deprivation of defendants' rights, counsel stated further witnesses were unnecessary and rested. The motion to suppress was denied.

Before the second trial, both defendants' attorneys[1] moved, at different times, for another hearing on a motion to suppress identification testimony. It was argued that the first hearing had been insufficient to adequately apprise the court of all the alleged pretrial irregularities that occurred in the identification process and that new grounds would now be urged to support a suppression of identification testimony.

In order to be entitled to suppress identification testimony, the burden is on the defendants to prove that the pretrial procedures were so unnecessarily suggestive and conducive to irreparable mistaken identification that they were denied due process of law. (*People v. Johnson,* 45 Ill. 2d 38, 257 N.E.2d 3.) At the hearing held on defendants' motion to suppress the identification testimony, the only evidence offered in support of their written motion to suppress was defendants' testimony regarding the absence of counsel at their preindictment lineups. Both the lineups and the motion to suppress in the instant case were conducted prior to the decisions of *Kirby v. Illinois,* 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *People v. Burbank,* 53 Ill. 2d 261, 291 N.E.2d 161, both cases holding that the right to counsel at a lineup attaches only after the initiation of adversary judicial criminal proceedings. Because those decisions are not retroactive, we are not required to determine whether this record presents facts indicating the initiation of adversary judicial criminal proceedings. (See *People v. Hudson,* 46 Ill. 2d 177, 263 N.E.2d 473; *People v. Anderson,* 121 Ill. App. 2d 313, 257 N.E.2d 594.) Rather, at the time of the instant proceedings, it was clear that defendants had no absolute right to counsel at a preindictment lineup. (*People v. Palmer,* 41 Ill. 2d 571, 244 N.E.2d 173; *People v. Rodgers,* 3 Ill.

---

[1] During the first trial, both defendants were represented by the same attorney. At the second trial, both defendants had other counsel.

App. 3d 85, 279 N.E. 2d 72, *aff'd*, 53 Ill. 2d 207, 290 N.E.2d 251.) The trial court correctly denied the motion to suppress the identification testimony based solely on the absence of counsel at the preindictment lineups.

■■ Defendants also argue that the declaration of a mistrial vitiated the effect of the court's ruling on their first motion to suppress and thus, they were entitled to a hearing on their second motion to suppress.

The general rule is that once a motion to suppress has been ruled upon by one judge, that motion cannot be relitigated later before another judge, absent a showing of exceptional circumstances or of any evidence that has become available since the first hearing to suppress. (*People v. Armstrong*, 56 Ill. 2d 159, 306 N.E.2d 14; *People v. Gierbolini*, 27 Ill. App. 3d 75, 327 N.E.2d 297.) In the instant case, there has been no showing of exceptional circumstances and counsel's offer of proof after the refusal to hear the second motion to suppress indicated no new evidence that was not available at the time of the first hearing.

Defendants attempt to avoid application of the general rule by arguing that the declaration of the mistrial somehow vitiated the ruling on the first motion to suppress. Defendants rely on *Haywood v. Swift & Co.*, 53 Ill. App. 2d 179, 202 N.E.2d 880. In *Haywood*, the court stated that a mistrial vitiates "all the proceedings" up to the time the mistrial is granted. (53 Ill. App. 2d 179, 181.) However, *Haywood* did not involve a mistrial vitiating pretrial proceedings. Indeed, that statement in *Haywood* was dictum since the fact that a mistrial had been granted had no importance to the holding announced by the court. We have been directed to no case dealing explicitly with the effect of a mistrial on pretrial proceedings.

A mistrial is granted because of some fundamental failure in the proceedings, the damaging effect of which on the jury cannot be removed by admonitions or instructions. It is the remedy granted when the minds of the jurors have become so tainted that one party cannot receive a fair trial. (88 C.J.S. *Trial* §36b (1955).) It is because of this taint on the minds of the jurors that the jury is discharged. It is thus apparent that only those proceedings which have caused the mistrial are vitiated by that order. While in the usual case, this could well be only trial proceedings, we are unwilling to enunciate any such absolute rule. We can envision a situation where it was error at a pretrial proceeding that caused the mistrial. Under that circumstance, both the pretrial and trial proceedings would surely be vitiated. We hold that it is only those proceedings which have caused the mistrial that are vitiated by the mistrial.

In the instant case, the cause of the mistrial was wholly unrelated

to the pretrial motion to suppress. It was granted entirely because of trial occurrences. As a result, any prejudice to defendants was obviated by vitiating only the trial proceedings. The instant jury was not in any way involved with the pretrial motion to suppress. Thus, the discharge of the first jury and the empaneling of the second jury did not give defendants any greater right to a second hearing on their motion to suppress than they had before the mistrial. Under the facts of this case, the mistrial did not vitiate the pretrial proceedings.

■■ We now consider the arguments raised by defendant Sims in support of his motion for another hearing on the motion to suppress identification testimony. He makes factual allegations not supported by the transcript of the hearing on the motion to suppress. However, as noted above, such a motion cannot be relitigated absent a showing of exceptional circumstances or new evidence not available before. (*People v. Armstrong*; *People v. Gierbolini.*) Such a rule should apply as effectively on appeal as it does in the court below. Indeed, there are stronger considerations (such as the inability of the State to test such allegations in an adversary proceeding and the superior ability of the trial judge to assess credibility of witnesses) for such a rule on appeal. Consequently, the arguments are considered waived.

■■ However, even assuming the suggestiveness of the pretrial identification procedures, an in-court identification is permissible if it has an origin independent of the tainted pretrial identification. (*People v. Patrick*, 53 Ill. 2d 201, 290 N.E.2d 227; *People v. Holmes*, 6 Ill. App. 3d 254, 285 N.E.2d 561.) In the instant case both the victim and Officer Jasch had ample opportunity under sufficient lighting to make on-the-scene identifications of both defendants. The victim was with both defendants for approximately one hour and at several times was only inches away from them. Officer Jasch observed both defendants for several minutes on Lake Shore Drive. Considering the totality of the circumstances, we hold that, even assuming the pretrial identifications were tainted, there was a sufficient independent origin for the in-court identifications.

### III

■■ Defendant Sims next argues that his arrest was without a valid arrest warrant and without probable cause and, therefore, his in-court identification should have been suppressed. (*Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Bean*, 121 Ill. App. 2d 332, 257 N.E.2d 562.) Specifically, Sims argues that the complaint for arrest warrant and the arrest warrant contained in the record are falsified documents used by the police to justify an otherwise un-

lawful arrest. Additionally, Sims argues that the State suppressed the true circumstances of his arrest and used perjured testimony to sustain the arrest warrant.

Prior to the second trial, a hearing was held on defendant Sims' motion to quash his arrest warrant. Officer Miller testified that on the morning of December 6, 1971, he had a conversation with Officer Friedman. Officer Friedman informed him that an individual named Henderson had been arrested for certain crimes and that an associate of Henderson's, a James Sims, was also wanted because Officer Jasch had picked Sims' picture out of a group of eight photos. Miller was asked to seek an arrest warrant for Sims. Based on that information, Officer Miller went to a branch police court and executed a complaint alleging the armed robbery of the victim. The judge inquired of Officer Miller if the signature on the complaint was his and whether the facts as alleged in the complaint were true. After being assured that they were, a warrant was issued for the arrest of defendant Sims. Defendant Sims testified that he voluntarily surrendered himself to the police on December 8 after he was allegedly told that the police had a warrant for his arrest.

Defendant Sims now complains of certain alleged "irregularities" in the complaint for arrest warrant and arrest warrant itself. Relying on these irregularities, defendant concludes that the documents were "manufactured" after his arrest.

We find it unnecessary to set out the alleged "irregularities" relied on to question the arrest warrant. Suffice it to say that what defendant claims is missing from those documents is, in fact, not required on those documents. Further, we have examined the questioned documents in light of defendant's challenges and find nothing suspicious about their execution. We conclude that the arrest warrant was validly issued to Officer Miller and sufficiently established on defendant's motion to quash. Defendant's arrest pursuant to that warrant was therefore proper.

Moreover, even assuming that the complaint and arrest warrant were defective, defendant's in-court identification would not necessarily have to be suppressed if, at the time of arrest, reasonable grounds to arrest defendant without a warrant existed. (*People v. Davis*, 20 Ill. App. 3d 948, 314 N.E.2d 723; *People v. Grace*, 8 Ill. App. 3d 847, 290 N.E.2d 318; see *United States v. Watson*, 44 U.S.L.W. 4112 (January 26, 1976).) A police officer has probable cause to arrest without a warrant when the facts and circumstances within his knowledge are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty thereof. (*People v. Higgins*, 50 Ill. 2d 221, 278 N.E.2d 68; *People v. Fisher*, 2 Ill. App.

3d 7, 276 N.E.2d 103.) The question of whether a police officer had probable cause to arrest a defendant must be judged in the light of the totality of the circumstances presented in a given case. (*People v. Clay*, 55 Ill. 2d 501, 304 N.E.2d 280; *People v. Toliver*, 133 Ill. App. 2d 266, 273 N.E.2d 274.) In determining the existence of probable cause when police officers are working together, the knowledge of each officer is the knowledge of all. (*People v. Peak*, 29 Ill. 2d 343, 194 N.E.2d 322.) Consequently, an officer may act on information supplied by another officer. *People v. Wrona*, 7 Ill. App. 3d 1, 286 N.E.2d 370.

Testimony at the instant hearing to quash disclosed that the police department had already arrested one individual in connection with the armed robbery of Officer Jasch and the armed robbery and rape of another. The police department was also aware that Officer Jasch had made a photographic identification of defendant Sims, an associate of the individual in custody, as the second participant in one of the armed robberies.[2] We find such an identification constituted reasonable grounds to suspect defendant Sims of the armed robbery of Officer Jasch. Thus, when defendant Sims voluntarily appeared at the police station, his arrest, even if warrantless, was lawful. See *People v. Henderson*, 20 Ill. App. 3d 120, 312 N.E.2d 655.

■■ Defendant Sims' argument that the State suppressed the true circumstances of his arrest, and his allegations that Officer Miller's testimony was perjury is premised entirely on a document in the record entitled "order setting bail." Defendant emphasizes the fact that a different judge signed that document than had signed the arrest warrant, and that the order setting bail indicated that he was charged with rape and aggravated kidnapping in addition to armed robbery. However, it is not unusual for a different judge to be sitting when a defendant is afforded a hearing on the setting of bail. Nor is it unusual for a defendant to be ultimately charged with additional crimes to those charged in the original arrest. We find no indication in the present record, including the grand jury testimony defendant directs us to, to support a finding of suppression of favorable evidence or perjury on the part of the prosecution.

---

[2] We note that the second victim had also, on the morning of December 6, made a photographic identification of defendant Sims as the second individual involved in the crimes. Although not presented at the hearing to quash, this testimony could be considered in determining whether the totality of the circumstances constituted probable cause for defendant Sims' arrest without a warrant. *People v. Braden*, 34 Ill. 2d 516, 216 N.E. 2d 808; *People v. Cowan*, 1 Ill. App. 3d 601, 274 N.E.2d 263.

## IV

■■ Defendant Henderson contends that the trial court erred in denying his motion to quash his arrest and to suppress evidence seized in the subsequent search. Defendant argues that the police did not have sufficient probable cause to arrest him without a warrant. The relevant testimony presented at defendant's motion to quash his arrest is as follows:

Defendant Henderson testified that he was in Gene's Lounge, at 91st and Greenbay, drinking early on the morning of December 6, 1971. After drinking for 15 to 30 minutes, he and a companion left the tavern. As they left, they were arrested for "suspicion of firing a firearm within the city limits." No arrest warrant was shown to defendant and he was doing nothing illegal at the time of his arrest.

Police Officer Galich testified that he was off duty and driving home in a private vehicle with another police officer early on the morning of December 6, 1971. Through police channels he had previously received information concerning two individuals wanted for a rape and robbery which had occurred on December 4, 1971. One of the wanted individuals was described as a male Negro, approximately 25 years old, five feet nine, 165 pounds; the other as a male Negro, five feet four, 145 pounds; one was reported to have a cast on his foot. Both were reported to be driving a turquoise 1965 Pontiac with North Carolina or South Carolina license plates, DZ 64, the last two numbers unknown.

In the vicinity of 9000 South Greenbay, he observed a turquoise 1965 Pontiac with North Carolina license plates DZ 6452. As the Pontiac slowed down, the officers passed it and observed one occupant in the car. The Pontiac then pulled into an alley and stopped. The officer circled the block and then stopped at a telephone so that his partner could call for assistance.

The Pontiac was again moving as a marked squad car with one officer arrived. Although Officer Galich lost sight of the Pontiac for approximately ten seconds, he saw the car stop outside Gene's Lounge and the driver go into the tavern. At that time he observed that the individual matched the description given in the police bulletins and that the individual had a cast on one of his feet. Officer Galich waited outside the tavern and after approximately one minute defendant Henderson came out and was placed under arrest.

Police Officer Malinowski was with Officer Galich on the morning of December 6, 1971 and testified to substantially the same facts.

On cross-examination of Officer Malinowski, defendant introduced one police bulletin that listed the wanted vehicle as having North or South Carolina license plates CD 6479 or CZ 6479. He also elicited testimony

that the police bulletin stated the individual with the cast had it on his left foot, not his right foot as defendant Henderson had.

Defendant then called as a witness the officer that first arrived in response to Officer Malinowski's call for assistance. He testified that he was with Officer Galich when Galich first arrived at Gene's Lounge and, at that time, the Pontiac was already empty. He first saw defendant Henderson as Henderson left the tavern.

The test of probable cause for an arrest without a warrant is whether a reasonable and prudent man in possession of knowledge which has come to the arresting officer would believe the person to be arrested is guilty of the crime. (*People v. Bambulas*, 42 Ill. 2d 419, 247 N.E.2d 873.) It is something less than evidence that would result in conviction and is based on factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *People v. Macias*, 39 Ill. 2d 208, 234 N.E.2d 783.

In the instant case, the officers had a detailed description of the vehicle sought in connection with the rape and armed robberies. Even assuming that there was some discrepancy as to the letters on the license plates, there was uncontradicted testimony that the police were looking for a turquoise 1965 Pontiac with North or South Carolina plates, the first two numbers being 64. In addition to that information, the police also knew that one of the wanted individuals had a cast on one leg. Thus, when the officers observed a turquoise 1965 Pontiac with North Carolina plates beginning with 64, and when they saw that the driver had a cast on one leg (whether they saw him going in or coming out of the lounge is immaterial), they had ample reason to believe the driver was the sought-after perpetrator of a rape and armed robberies. (See *People v. Turner*, 32 Ill. App. 3d 221, 336 N.E.2d 49.) Such a detailed description of a car with out-of-State license plates is a significant fact in determining whether probable cause to arrest without a warrant existed. (*People v. Murphy*, 3 Ill. App. 3d 345, 277 N.E.2d 721.) Although defendant emphasizes certain discrepancies in the testimony (such as confusion as to the letters in the license plates, whether the wanted individual had a cast on his left or right foot, and whether defendant was actually seen going into the lounge), we find the totality of the facts more than sufficient to create the probable cause necessary to support a lawful arrest without a warrant. *People v. Drayton*, 7 Ill. App. 3d 812, 288 N.E.2d 922.

## V

In one indictment, defendants were charged with the aggravated kidnapping, rape, deviate sexual assault, and armed robbery of the

victim. In a separate indictment, defendants were charged with the armed robbery of Officer Jasch. On motion of the State, and over defendants' objection, the indictments were consolidated for trial. Both defendants now claim that the consolidation of the indictments was a prejudicial joinder of disassociated felonies.

Two or more indictments may be tried together if the offenses charged in the different indictments could have been joined in a single indictment. (Ill. Rev. Stat. 1971, ch. 38, par. 114—7.) Two or more offenses may be charged in the same indictment if the offenses "are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." (Ill. Rev. Stat. 1971, ch. 38, par. 111—4(a).) The question thus becomes whether the armed robbery of Officer Jasch and the aggravated kidnapping, rape and armed robbery of the victim were part of the same comprehensive transaction. Defendants argue that the offenses were completely unrelated and there was insufficient evidence to link the two indictments.

While defendants emphasize certain aspects of the testimony of Officer Jasch and the victim that do not coincide, those are only isolated instances in the total testimony. The vast body of the testimony indicates that both the officer and the complainant were victims of the same comprehensive transaction.

The victim was abducted by individuals she identified as defendants in her apartment building garage at approximately 8 p.m. on December 4, 1971. A short time after 8 p.m., not far from complainant's apartment building, Officer Jasch stopped a vehicle occupied by two individuals whom he identified as defendants. Officer Jasch testified that, as he struggled with defendants, defendants shouted: "Get him in the car, get him in the car." The complainant testified that, when defendants' car first stopped, she heard scuffling sounds outside the car and shouts of "Get him in the car, get him in the car." Officer Jasch recovered a bag of diapers which he saw fall from the car while it was stopped on Lake Shore Drive. Complainant was able positively to identify that package recovered by Officer Jasch as one of the packages she was carrying when abducted because of special design characteristics on the package. Complainant also testified that, after their initial stop, defendant Sims told her: "That cop was going to save your life but we took care of him." Julius Roth testified that he saw two men standing with a police officer on Lake Shore Drive at approximately the same spot where Officer Jasch testified he stopped defendants. Mr. Roth saw the police officer run into traffic on Lake Shore Drive (as Officer Jasch testified he did) and then saw the vehicle that had been stopped pass him (Mr. Roth). As he drew closer to that vehicle, an individual in the

back seat pointed a shiny object at him. The complainant testified that, after the initial stop, defendant Sims did, in fact, point a gun out the rear window. There was further testimony that when defendant Henderson was arrested, his driver's license, containing an inscription written on the back by Officer Jasch and confirmed as being in his handwriting, was recovered. Finally, Officer Jasch's gun was recovered from Miss Emma Jean Landfair who testified that defendant Henderson had given it to her.

■■ We find that this evidence overwhelmingly established that the armed robbery of Officer Jasch and the aggravated kidnapping, rape, and armed robbery of the complainant were part of the same comprehensive transaction for the purpose here involved. As such, they could have been brought in a single indictment. (*People v. Mowen*, 109 Ill. App. 2d 62, 248 N.E.2d 685.) Consequently, the trial court did not err in consolidating the separate indictments. *People v. Perry*, 47 Ill. 2d 402, 266 N.E.2d 330.

Defendants also argue that they were indicted twice for aggravated kidnapping. However, the record clearly indicates that aggravated kidnapping was charged in only one count of one indictment. Defendants mistakenly confuse a copy of the "true bill" with another indictment for aggravated kidnapping.

■■ Finally, defendant Sims contends that, if all the different charges did in fact result from the same comprehensive transaction, he was put in double jeopardy by multiple convictions. However, the concept of double jeopardy has no application where two or more separate and distinct crimes are committed during the same transaction. (*People v. Hairston*, 46 Ill. 2d 348, 263 N.E.2d 840.) The thrust of defendant's argument will be treated in greater detail later when we consider the propriety of the multiple and consecutive sentences.

## VI

■■ Both defendants next contend that the evidence presented at the preliminary hearing, specifically the identification testimony, was sufficient to establish probable cause and thus insufficient to bind them over to the grand jury. In addition, defendant Henderson argues that the judge who presided at the preliminary hearing unduly interfered in the examination of the victim and was predisposed to his guilt.

No matter how defendants' arguments are viewed, they are directed only at the quantum of evidence presented at the preliminary hearing: either the evidence was insufficient, or its presentation was improper. We have examined the transcript of the preliminary hearing and conclude there was no error in the conduct of those proceedings and that

the evidence adduced was more than sufficient to establish probable cause that defendants had committed the crimes charged.

Moreover, any question as to the sufficiency of the evidence to establish probable cause became moot when defendants were later indicted by the grand jury. (See *People v. Kent*, 54 Ill. 2d 161, 295 N.E.2d 710; *People v. Hyde*, 1 Ill. App. 3d 831, 275 N.E.2d 239.) On the facts of this case, the preliminary hearing proceedings are not, in any way, involved in the final determination of defendants' guilt or innocence. As such, and in view of the grand jury's indictment, any question as to the sufficiency of the evidence presented at the preliminary hearing is not a proper subject for our review.

## VII

■■ Defendant Sims next contends that he was denied due process of law at his arraignment when the court declined to grant a continuance to wait the arrival of his alleged retained private counsel and instead appointed the public defender to represent him at that proceeding.

At his arraignment, defendant Sims was asked whether he had retained private counsel and he informed the court that he had retained Mr. Sam Adam. When asked where he was, defendant responded: "He is supposed to be here. He told me." The court then stated that if Mr. Adam arrived, he could represent defendant; otherwise, the court would appoint the public defender for defendant for the instant proceeding. When defendant Sims objected the court stated that it had already waited a couple of times.[3] The assistant State's Attorney interjected that Mr. Adam had been in court earlier and had indicated at that time that he did not represent defendant Sims. Defendant then received a copy of the indictments. After the public defender entered a plea of not guilty and waived a reading of the indictments, the cause was assigned to another judge for trial.

It is well established that arraignment is a critical stage of the prosecution and that the right of counsel attaches before any plea is made or accepted. (*People v. Torres*, 18 Ill. App. 3d 921, 310 N.E.2d 780.) The right to counsel includes the right to be represented by counsel of one's choice, but important as it is, enjoyment of this right is not absolute. *People v. MacArthur*, 2 Ill. App. 3d 1077, 278 N.E.2d 530.

In the instant record, the only evidence that defendant had, in fact, retained Mr. Adam is defendant's own statements at the arraignment and now on appeal. Mr. Adam never filed an appearance on behalf of

---

[3] The common law record indicates that at least one continuance had already been granted to defendant.

defendant, nor did Mr. Adam ever represent defendant at any of defendant's many court appearances. Thus, there is a complete lack of factual support to sustain defendant's allegations that he was denied an opportunity to retain private counsel. Defendant must do more than merely assert he wants private counsel. He must make some showing that he has, in fact, retained private counsel or that he is able to retain private counsel. (See *People v. MacArthur.*) In the case at bar, defendant had already been granted one continuance and an assistant State's Attorney had been informed that Mr. Adam did not represent defendant. Under such circumstances, and considering the lack of factual support for defendant's allegations, the court did not err in appointing counsel for defendant.

Moreover, we note that the court's action in no way impaired or threatened defendant's rights. When appointed counsel pled defendant not guilty, he took the same action retained counsel would have taken. At an arraignment, there is no opportunity for counsel, whether retained or appointed, to do anything else on behalf of the accused. Defendant has failed to show prejudice, and we are unable to conceive of any, resulting from the court's action. Therefore, defendant was not denied due process of law. *People v. Rebenstorf,* 37 Ill. 2d 572, 229 N.E.2d 483.

## VIII

■■ Defendant Sims challenges the court's refusal to reduce his bail pending trial, and its refusal to set any bail after conviction pending appeal.

The trial court's refusal to reduce bail before conviction was an appealable order at the time reduction was refused. (Ill. Rev. Stat. 1971, ch. 110, par. 604(c).) Defendant's failure timely to appeal that order now precludes any consideration of its propriety.

Defendant's sole remedy for the refusal to set any bail after conviction was in Supreme Court Rule 609(b). (Ill. Rev. Stat. 1971, ch. 110A, par. 609(b)); *People v. Van Riper,* 127 Ill. App. 2d 394, 262 N.E.2d 141.) Defendant again did not avail himself of that opportunity.

■■ More importantly, neither order presents any ground for reversal of the instant convictions, and thus, is not properly before this court. *People v. Van Riper.*

## IX

■■ Defendant Sims next contends that the denial of his motion for substitution of judges was prejudicial error.

On June 9, 1972, Judge Downing declared a mistrial in defendant's original trial. On July 11, 1972, defendant moved for a substitution of

judges. (Ill. Rev. Stat. 1971, ch. 38, par. 114—5.) On that day, Judge Downing denied that motion. However, on October 10, 1972, Judge Fleischman replaced Judge Downing as the trial judge of record. Between July 11 and October 10, defendant only filed two motions before Judge Downing, and both were allowed. It thus appears, although the record does not indicate why, that defendant Sims received the exact relief he requested, that is, a substitution of judges.

Consequently, we need not decide whether denial of defendant's motion was error. For even assuming that it was error, defendant later obtained the exact relief for which he had petitioned. And since the only motions considered by Judge Downing prior to his replacement by Judge Fleischman were both decided favorably to defendant, defendant can claim no prejudice during the interim. We conclude that defendant's claim of prejudice is factually not supported by the record and is without merit.

## X

■■■ Both defendants argue that they were denied the proper number of peremptory challenges. At trial, each defendant was allowed six peremptory challenges. Both now claim that they were entitled to at least 12 and possibly 20 peremptory challenges.

Defendants' argument is based on the mistaken premise that they were indicted for aggravated kidnapping "for ransom" and on a misreading of section 115—4(e) of the Code of Criminal Procedure. (Ill. Rev. Stat. 1971, ch. 38, par. 115—4(e).) Section 115—4(e) states in pertinent part:

> "A defendant tried alone shall be allowed 20 peremptory challenges in a capital case * * *; except that, in a single trial of more than one defendant, each defendant shall be allowed 12 peremptory challenges in a capital case, 6 in a case in which the punishment may be imprisonment in the penitentiary, and 3 in all other cases. If several charges against a defendant or defendants are consolidated for trial, each defendant shall be allowed peremptory challenges upon one charge only, which single charge shall be the charge against that defendant authorizing the greatest maximum penalty."

Aggravated kidnapping for ransom was a capital offense (Ill. Rev. Stat. 1971, ch. 38, par. 10—2(b)(1)), which under section 115—4(e) would have entitled defendants to 20 peremptory challenges if they were tried separately or 12 peremptory challenges if they were tried together.

However, defendants were indicted for aggravated kidnapping other

than for ransom.[4] Aggravated kidnapping other than for ransom was not a capital offense. Rather, it was punishable only by a term of imprisonment in the penitentiary. (Ill. Rev. Stat. 1971, ch. 38, par. 10—2(b)(2).) And since defendants were tried together, the plain language of section 115—4(e) entitled each defendant to only six peremptory challenges. The trial court did not err in refusing each defendant more than six peremptory challenges.

## XI

■■ Both defendants next contend that the admission into evidence of a bill of sale for a 1965 Pontiac, taken from defendant Henderson when he was arrested, was prejudicial error.

When defendant Henderson was arrested, the police seized a bill of sale made out to defendant Henderson for a 1965 Pontiac. At trial, Officer Galich testified to obtaining that document when Henderson was arrested, and over defendants' objection, it was admitted into evidence.

The bill of sale was obviously proffered by the State to prove Henderson's ownership of the 1965 Pontiac. However, the State laid no foundation as to the genuineness or authentication of that document. As a result, the bill of sale was inadmissible hearsay and should have been excluded. (*In re Estate of Fidler*, 23 Ill. App. 3d 1046, 319 N.E.2d 822; *Summerville v. Rodgers*, 31 Ill. App. 2d 420, 176 N.E.2d 667.) The State now concedes that admission of the bill of sale was error, but argues that the error was harmless.

It is well established that, where the record contains sufficient competent evidence to establish the guilt of a defendant beyond a reasonable doubt, the judgment will not be reversed for error in admitting evidence unless it can be seen that the error was prejudicial. (*People v. Pelkola*, 19 Ill. 2d 156, 166 N.E.2d 54.) In the instant case, there was overwhelming evidence to support the jury's verdict without the bill of sale. *People v. Brown*, 9 Ill. App. 3d 730, 293 N.E.2d 1.

The jury had before it the positive identification of both the victim and Officer Jasch. The victim was face to face, only inches away, from defendant Sims for the entire time she was held captive in the automobile. When defendant Henderson was arrested, his driver's license had an inscription on it positively identified to be in the handwriting of Officer Jasch. In addition, Officer Jasch's revolver was recovered from

---

[4] Specifically, a kidnapping during which a felony was committed on the victim. Ill. Rev. Stat. 1971, ch. 38, par 10—2(a)(3).

an individual who testified to having received it from defendant Henderson.

Specifically, there was sufficient competent evidence to connect defendants to the 1965 Pontiac. Officer Jasch identified photos of defendant Henderson's 1965 Pontiac as similar to the car he stopped on Lake Shore Drive containing defendants. And another police officer testified to arresting defendant Henderson in that same car two days later.

Finally, whether defendant Henderson actually owned a 1965 Pontiac in no way tended to prove or disprove defendants' guilt of the crimes charged. Ownership of the vehicle was never in issue and, as such, was irrelevant. Under all the circumstances, we conclude that admission of the bill of sale was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

## XII

■■ Defendant Sims next contends that the State's instructions Nos. 10 and 11 misstated the law and denied him a fair trial.

The State's instruction No. 10 defined the crime of aggravated kidnapping. Instruction No. 11 listed the issues the State must prove to sustain a finding of guilty of aggravated kidnapping. Both were taken word for word from the Illinois Pattern Criminal Jury Instructions. IPI Criminal, Nos. 8.04, 8.05.

Defendant Sims argues that instruction No. 10 did not define the crimes of ordinary kidnapping or rape and thus material elements of the crime of aggravated kidnapping were left in doubt. However, no one instruction need state all the applicable law on any particular question. (*People v. Abbott*, 110 Ill. App. 2d 462, 249 N.E.2d 675.) Rather, the whole series of instructions must be examined to see if they provide guidance for the jury which was neither unfair nor incomplete. *People v. Jones*, 107 Ill. App. 2d 1, 247 N.E.2d 40.

In the instant case, the IPI instructions for both kidnapping and rape were also given to the jury. After an examination of all the instructions, we conclude that they fully and fairly covered the law applicable to aggravated kidnapping.

Although defendant also challenges the giving of the State's instruction No. 11, he fails to level any specific attack against that instruction. As noted, instruction No. 11 is the exact instruction suggested by IPI No. 8.05. Defendant was charged with aggravated kidnapping. Giving due consideration to that fact, the evidence presented at trial, and the governing law, there was no error in giving instruction No. 11. Ill. Rev. Stat. 1971, ch. 110A, par. 451(a).

All the instructions relative to aggravated kidnapping, taken as a

whole, accurately stated the governing law. (*People v. Porter*, 11 Ill. 2d 285, 143 N.E.2d 250.) There was no error in giving either instruction No. 10 or No. 11.

## XIII

■■ Defendant Sims next contends that he has been denied a complete transcript of all trial and pretrial proceedings and thus has been prevented from adequately pursuing his appeal. Defendant also contends that counsel for his second trial was denied a transcript of the proceedings of his first trial and other important pretrial proceedings, resulting in ineffective assistance of counsel at his second trial.

The record in the instant case consists of five volumes totaling over 3000 pages. The vast majority of the dates for which defendant contends that proceedings are missing from the record are dates on which continuances were granted. A transcript of those proceedings could afford defendant no possible basis for appeal. The remaining dates for which defendant contends that proceedings are missing are dates on which defendant simply alleges that proceedings occurred. There is no indication in either the common law record or the report of proceedings that defendant was in court on the dates alleged.

The trial record, consisting of the common law record and the report of proceedings, imports absolute veracity. (*People v. Sigafus*, 42 Ill. 2d 272, 246 N.E.2d 255.) The trial record, properly authenticated, is the sole conclusive and unimpeachable evidence of the proceedings in the trial court. *People v. Spence*, 133 Ill. App. 2d 171, 272 N.E.2d 739.

After comparing the common law record and the report of proceedings, we conclude that defendant has been provided with a transcript of all proceedings to which he is entitled. (*Griffin v. Illinois*, 351 U.S. 12, 100 L.Ed. 891, 76 S. Ct. 585.) Defendant's allegations that certain proceedings have been omitted or that certain transcripts have been altered are not supported by the record.

Similarly, defendant's allegations that his trial counsel was denied transcripts of earlier proceedings is patently contradicted by the record. At defendant's second trial, counsel referred to transcripts of earlier proceedings on numerous occasions for impeachment purposes.

Neither defendant on appeal, nor his trial counsel, were denied any transcripts of important trial or pretrial proceedings. Defendant's allegations to the contrary are completely without factual support.

## XIV

■■ Defendants also urge an abundance of allegations charging the wilful use of perjury by the prosecution and the suppression by the prosecution of evidence favorable to defendants.

The knowing use of false testimony by the prosecution to procure a conviction does constitute a denial of due process. (*Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173.) However, for false testimony to constitute perjury, that testimony must have been material to defendant's guilt or innocence. (See *People v. Harris*, 102 Ill. App. 2d 335, 242 N.E.2d 782.) Mere conflicts in the testimony of a witness with prior statements made by him does not establish that the witness has given perjured testimony. *People v. Lagios*, 39 Ill. 2d 298, 235 N.E.2d 587.

It would serve no useful purpose to set out all of the alleged instances of perjury by the State's witnesses. Suffice it to say that defendants are correct in noting certain discrepancies in the testimony of various witnesses with their prior statements at the preliminary hearing, grand jury, and first trial. However, all are instances of minor conflicts with prior testimony. After an examination of all the alleged conflicts, we conclude that even when all are considered together, they do not constitute false testimony. Rather, the conflicts are the usual discrepancies that occur when a witness is asked to repeat the same story many times over an extended period of time. In fact, an exact recital, at different times and places after the passage of time, strongly suggests the recitation of a past event by rote or script.

■■ As for the alleged suppression of evidence favorable to defendants, we note there is no evidence to support such allegations. When defendants requested certain reports or statements at trial, they were informed no such reports or statements existed. Now on appeal, defendants continue to insist such evidence existed. Their infrequent references to the record to support such allegations are not helpful. Defendants either confuse the purpose of certain documents or completely misread certain testimony. Defendants' assertions that evidence was suppressed is based on speculation without any evidentiary basis. *People v. Harris*, 55 Ill. 2d 15, 302 N.E.2d 1.

We have reviewed the record and find no evidence to support any allegations of perjury or suppression on the part of the prosecution.

## XV

■■ Finally, both defendants level a broad attack on their sentences, claiming they were both improper and excessive. Both defendants were sentenced to consecutive terms of 20 to 60 years for rape, 15 to 45 years for aggravated kidnapping, 15 to 45 years for one count of armed robbery, and 10 to 30 years for the other count of armed robbery.

Defendants first contend that separate convictions and sentences for all four crimes were improper because all the offenses arose from the

same transaction. In this regard, defendants rely solely on *People v. Ritchie*, 66 Ill. App. 2d 302, 213 N.E.2d 651, and the cases cited therein.

In *Ritchie*, the defendant was charged and found guilty of rape and burglary with intent to commit rape. On appeal, the appellate court affirmed the conviction for rape, but reversed the conviction for burglary with intent to commit rape, holding that both offenses were part of the same conduct or transaction. On defendant's appeal to the Illinois Supreme Court, the State attempted to cross-appeal from the reversal of the burglary conviction. (*People v. Ritchie*, 36 Ill. 2d 392, 222 N.E.2d 479.) Although the Supreme Court held that the State had no right to appeal the reversal of the burglary conviction, the court questioned the appellate court's reversal of the burglary conviction. Referring to the cases relied on by the appellate court, the Supreme Court stated:

> "The State convincingly argues that the principle set forth in the cited cases is not applicable; that the crimes there charged arose out of a single act, for instance, rape and incest involving the same person, and armed robbery and grand larceny involving the same money, whereas here there are two separate and distinct acts giving rise to separate and distinct substantive offenses." (36 Ill. 2d 392, 397.)

Moreover, on two other occasions, the Supreme Court has observed that the appellate court's decision in *Ritchie* is questionable. (*People v. Johnson*, 44 Ill. 2d 463, 475, 256 N.E.2d 343; *People v. Raby*, 40 Ill. 2d 392, 404, 240 N.E.2d 595.) Finally, in *People v. Weaver*, 93 Ill. App. 2d 311, 236 N.E.2d 362, another district of the appellate court expressly rejected the reasoning of *Ritchie* and affirmed separate convictions for rape and burglary with intent to commit rape. We, too, find *Ritchie* to be of questionable precedential value.

While it is true that a person may not be convicted of multiple offenses arising out of the same act or the same conduct (*e.g., People v. Schlenger*, 13 Ill. 2d 63, 147 N.E.2d 316; *People v. Scott*, 57 Ill. 2d 353, 312 N.E.2d 596), that rule does not preclude separate convictions for offenses that arise from a series of closely related acts which are clearly distinct and require different elements of proof. *People v. Williams*, 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Harper*, 50 Ill. 2d 296, 278 N.E.2d 771; *People v. Johnson*.

Defendants' reliance on the former rule is misplaced. Their conduct was not similar to breaking into a house to steal by stealth, and, once inside, waking the occupants and robbing them at the point of a gun (burglary and armed robbery) (*People v. Williams*); or or raping a female under the age of 16 (rape and indecent liberties with a child) (*People v. Lilly*, 56 Ill. 2d 493, 309 N.E.2d 1); or grabbing someone and

taking his wallet (battery and theft) (*People v. Murrell*, 60 Ill. 2d 287, 326 N.E.2d 762). Defendants' argument that all four crimes were motivated by one desire, to rape the victim, is not supported by the record and, in any event, does not bring them within the same act or same conduct rule. Rather, the rape could have been accomplished without the kidnapping and without either armed robbery. See *People v. Johnson.* · Defendants specifically complain that the armed robbery of Officer Jasch was necessary to avoid apprehension during their crimes. However, the Supreme Court has specifically upheld separate convictions for crimes committed to "avoid injury or apprehension." *People v. Williams*, 60 Ill. 2d 1, 14.

In the instant case, defendants committed an armed robbery of the victim in her garage. That crime completed, they proceeded to kidnap her. During that crime, they perpetrated another armed robbery on Officer Jasch. That crime completed, they raped the victim. Although all were closely related acts, all were clearly distinct and each required different elements of proof. The court did not err in imposing separate convictions for each of the four crimes.

Defendants next challenge the propriety of separate convictions at least for rape and aggravated kidnapping. Defendants argue that aggravated kidnapping was an "included offense" of the rape. Defendants first argue that kidnapping is "always an included offense in case of rape and should not carry a separate sentence." Defendants also argue that the "act constituting rape and the act constituting aggravated kidnapping were part of the same transaction." Defendants conclude that, because there was no independent motivation for the two crimes, separate convictions cannot stand.

Defendants' argument that kidnapping is always an included offense in a case of rape was rejected by the Supreme Court in *People v. Canale*, 52 Ill. 2d 107, 285 N.E.2d 133. In the instant case, the victim was driven from the north side of Chicago to the south side and confined for at least an hour. Defendants' argument that the kidnapping was a necessary element of the rape is without merit.

Defendants' related argument that the aggravated kidnapping and the rape were part of the same transaction has been considered numerous times by the courts of this State and rejected. (*People v. Whiteaker*, 30 Ill. App. 3d 848, 334 N.E.2d 200; *People v. Long*, 30 Ill. App. 3d 815, 333 N.E.2d 534; *People v. Patton*, 25 Ill. App. 3d 840, 322 N.E.2d 592; *People v. Jones*, 6 Ill. App. 3d 669, 286 N.E.2d 87, *aff'd.*, 60 Ill. 2d 300, 325 N.E.2d 601; *People v. Pardue*, 6 Ill. App. 3d 430, 286 N.E.2d 29.) That the kidnapping would be aggravated due to the commission of the rape would not render them the same for prosecution. (*People v. Pat-*

*ton; People v. Jones.*) When these cases are combined with our earlier conclusion that *all* the instant crimes were clearly distinct and required different elements of proof, further comment on defendants' instant argument is unnecessary.

■■ Defendants next argue that, even if the imposition of separate convictions was proper, the imposition of consecutive sentences was improper. Defendants' argument on this point is based on Section 5—8—4(c) of the Unified Code of Corrections which in pertinent part provided:

> "The aggregate minimum period of consecutive sentences shall not exceed twice the lowest minimum term authorized under Section 5—8—1 for the most serious felony involved." (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(c).)

All of the instant crimes were Class 1 felonies, the lowest minimum term authorized for which is 4 years. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(2).) Consequently, pursuant to section 5—8—4(c) the aggregate minimum of defendants' sentences cannot exceed 8 years.

■■ Although defendants were sentenced before the Unified Code of Corrections became effective, they are entitled to the benefit of any mitigative provisions of the Code since their case has not reached final adjudication. (*People v. Chupich,* 53 Ill. 2d 572, 295 N.E.2d 1; *People v. Harvey,* 53 Ill. 2d 585, 294 N.E.2d 269.) And although section 5—8—4(c) has since been modified so that the sentences imposed here would now be permissible (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(c)), defendants are entitled to the benefit of the more favorable intervening statute. (*People v. Morgan,* 59 Ill. 2d 276, 319 N.E.2d 764; *People v. Williams.*) It is thus apparent that defendants' minimum consecutive sentences totalling 60 years cannot stand.

During oral argument, the State suggested that notwithstanding *Chupich, Harvey,* and *Morgan,* subsection (h) of section 5—8—4 of the Unified Code of Corrections denies defendants the benefit of subsection (c). While subsection (h) expressly limits the benefits of subsection (c) to defendants sentenced after the effective date of the Code, that provision of subsection (h) has recently been declared unconstitutional as violative of the equal protection clauses of the Federal and State constitutions. *People v. Nicks,* 62 Ill.2d 350, 342 N.E.2d 360.

Consequently, as mandated by *Morgan,* we hereby modify defendants' sentences to run concurrently rather than consecutively.

■■ The sole remaining argument is that the sentences imposed were excessive. In addition to the vicious and brutal nature of the crimes committed, the trial court had before it the prior criminal records of defendants. Defendant Henderson had prior convictions for both armed

robbery and unlawful use of weapons. Defendant Sims had a prior conviction for rape. The imposition of a sentence is a matter of judicial discretion and the sentence imposed by the trial court should not be altered by a reviewing court unless it is apparent that the judge abused his discretion. (*People v. Burbank*, 53 Ill.2d 261, 291 N.E.2d 161.) The trial court is in a better position after trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed than are courts of review. (*People v. Sprinkle*, 56 Ill.2d 257, 307 N.E.2d 161.) We find no reason presented by the instant record to disturb the length of the sentences.

Accordingly, for the reasons set out above, the judgments of conviction are affirmed. The sentences thereon are modified to run concurrently, and as modified, are affirmed.

Affirmed as modified.

LEIGHTON and HAYES, JJ., concur.