THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ERNEST TATE, Defendant-Appellant.

First District (5th Division)   No. 77-4

Opinion filed August 25, 1978.—Rehearing denied September 22, 1978.

Howard T. Savage and Patricia Unsinn, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and Mark E. Rakoczy, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and sentenced to serve 5-15 years in the Illinois Department of Corrections. On appeal he contends that he was not convicted beyond a reasonable doubt, and that the trial court erred when it: (1) admitted into evidence a statement allegedly made by him and not disclosed to the defense prior to trial, (2) allowed the State to make repeated references to his prior arrests, (3) refused to allow defense counsel to testify as a defense witness, (4) allowed into evidence testimony concerning certain acts of a third person, (5) restricted his examination of a witness and argument to the jury on the subject of that witness' interest, bias or prejudice, (6) allowed testimony and arguments concerning the "policy" of Sears stores, and (7) imposed sentence prior to the disposition of his post-trial motions.

The following pertinent evidence was adduced at trial.

*For the State*
  *Richard Meiners*
  On October 23, 1973, at approximately 1:45 a.m. he was working at a Clark gas station at 1745 West Foster in Chicago when two men came into the front office requesting a tow truck. He told them he did not have one, but that there was one at Ashland and Lawrence. They remained there three to five minutes. After one of the men purchased a bag of cookies they left, returning approximately two minutes later asking how far away Ashland and Lawrence was. He responded that it was about eight blocks away. One of the men then asked him for a package of Kool cigarettes.

He identified that man as Ernest Tate. As he started to get the cigarettes from the back room, Tate pulled out a chrome-plated revolver with a brown and white handle and said, "This is it. Get in the back." Tate stood about a foot and a half away from him, face to face in the front office, which is a four-foot by nine-foot space illuminated by approximately 25 neon lights. Tate pushed him into the back room, which is a small room lighted by two 150 watt light bulbs. Tate told him to "Turn around and shut up." Tate went through his pockets taking approximately $90 of the service station's money and his wallet, which contained approximately $5, his driver's license, Sears credit card and other identification. The other man opened the cigarette cabinet and took approximately six cartons of Kools. Tate then told him to lie on the floor for five minutes. They then walked out the front door, and shortly afterward a customer walked in. Meiners told the customer he had just been robbed. As the customer called the police, Meiners ran outside and stopped a squad car that was going by. The police drove him around, but they were unable to find the offenders. He described Tate to the police as being approximately 5'10", 160 lbs., 20 to 25 years old, with pock marks on the side of his face, wearing brown pants, a checkered shirt, a hat with a brim and high heel shoes. A police evidence technician also came and took a fingerprint from the door which led to the back room. Later that morning at about 9 he called Sears and advised that his credit card had been taken. He later went to the Racine Police Station where he viewed a five-man lineup and positively identified Tate as the man who had robbed him the night before. His driver's license was returned to him at the police station, but his Sears credit card was not returned.

On cross-examination he denied directing an evidence technician to take a fingerprint off of the door to the back room. He admitted that although he watched the two offenders as well as he could, he kept being turned around and did not always have them in sight. He admitted that although the two offenders were very close in height, Tate was approximately his own size, which was 5'10", and the other man was slightly taller. He denied telling Officers Murray and Halberson that after the two offenders left the first time he thought something was wrong and put a dime in the phone to call the police, but he did tell them that he was thinking about it. He acknowledged that after the robbery, although he told the police that Tate had a slight beard, he did not tell them that Tate had a scar on his forehead or a mustache.

On redirect examination, he testified that the hat which Tate wore throughout the robbery had a round brim which covered the scar on his forehead.

*Harvey Gentry, security officer for Sears at 6233 S. Halsted*

On October 23, 1973, he responded to a call at the store's radio and television department, where he observed Ernest Tate and a Mr. Sellers

who was accepting a sales slip from a salesman. Sellers and Tate left together and went to the fourth floor credit department. After he called the operator for assistance, he and other security officers arrested Sellers and Tate and took them to the security officer on the second floor. Sellers had in his possession the sales slip, a Sears credit card, a driver's license and other identification cards, all of which bore the name of Richard Meiners. The driver's license was later given to the police, and the credit card was given to a Mr. Lockett and put in the file. It is company policy that when a credit card belonging to someone else is recovered the credit card is destroyed and a new one issued. To the best of his knowledge this is what happened to Meiners' card.

On cross-examination he acknowledged having a conversation in the afternoon of October 23 with Officers Murray and Halberson at the Racine Police Station, but denied telling them that Sellers told the salesman he would have to go to his car to get the credit card. The saleslip and credit card were put into an envelope, but he did not recall what happened to it. He admitted that he never heard any conversation between Tate and Sellers. He acknowledged that after a search, he found that Tate had nothing belonging to Meiners.

*William F. Murray, Chicago Police Investigator*

On the afternoon of October 23, 1973, he met with Richard Meiners and later with Harvey Gentry at the police station. Gentry gave him Meiners' driver's license, which he returned to him. A lineup in which Tate and Sellers were the third and fifth men was conducted at the station. Following an identification by Meiners, he arrested Tate on the charge of armed robbery. Tate and Sellers were both searched and found to have Kool cigarettes in their possession.

On cross-examination he acknowledged that he only observed the second search of Tate which was conducted after the lineup and that nothing with Meiners' name on it was taken from Tate at that time. He did not see a motel key, but did find a motel receipt which he returned to Tate. He acknowledged that Sellers told him he was 5'9" and that Tate in his shoes appeared to be 5'11". He denied that Sellers appeared taller than Tate in the lineup, but admitted that in his report he described Sellers as being 6 feet and Tate as being 5'9".

On re-direct examination, he stated that his lineup report showed Sellers' height as 5'9", that the information is based on interview and observations, and that there are no facilities at the station for weighing and measuring prisoners.

*For the Defense*
*William F. Murray, Chicago Police Inspector*

He and his partner interviewed Meiners, who told them that after the two offenders left the gas station the first time, he suspected that

something was wrong and either did or was about to put a dime in the phone to call the police. He also interviewed Harvey Gentry, who said that Sellers told the Sears salesman that he had to go to his car to get his credit card.

*Anthony Russelle, Chicago Police Officer*

In the early morning hours of October 23, 1973, he and his partner responded to a call of an armed robbery at a Clark gas station where he talked to Richard Meiners. Meiners was nervous and upset when he described the offenders as being male Negroes, 20-25 years old. One of them was approximately 5'11", 170 lbs., had a revolver and wore brown pants, brown hat and a checkered shirt. The other man was approximately 5'9", 160 lbs. and wore a yellow shirt and brown pants. Meiners never mentioned any scars, nor can he recollect Meiners' mentioning a mustache or goatee.

On cross-examination he acknowledged that Meiners initially described the offenders as being approximately the same height, but then indicated that one was shorter, and he therefore put in his report that one offender was 5'9".

*Defendant Ernest Tate on his own behalf*

On October 22, 1973, he played cards with Larry Forzel, Anthony Miles and Eddie Moss from approximately 5:30 p.m. to 12:30 a.m. He and Forzel then went to Forzel's apartment on Diversey and Broadway, where they, Forzel's wife and her girl friend drank wine and talked for approximately one hour. The four of them went out to eat at a "greasy spoon" restaurant on the corner of Broadway and Diversey. At approximately 3 a.m. he began to look for a hotel room, and checked into the Commonwealth Hotel. He stayed there until approximately 9 a.m. when he and the young lady he was with left the hotel and went to a nearby restaurant. He intended to return, so he did not actually check out of the hotel, and he kept the key and receipt for his room.

He boarded a southbound bus and arrived at the Sears store on 63rd and Halsted after 10 a.m. After having two keys made, he went to the cafeteria on the second floor and purchased orange juice and a sweet roll. He drank half of the orange juice and noticed that there were flies in it. When he complained, he was told to speak to management on the fourth floor. He went there, but they offered him no help. He then went to the third floor record department, where he took out a cigarette and asked a man for a match. The man asked him how he liked a certain record player, and he responded that it looked good and should be worth it. After a few more words were exchanged, he started to leave, but was arrested by Harvey Gentry. He had seen Gentry on the elevator when he went to the fourth floor. The man he had been talking to, whose name was Sellers, was also arrested. He had not known Sellers prior to speaking

with him in the record department. He and Sellers were searched. The hotel receipt, keys and some money were taken from him, while a driver's license, fishing license and other identification were taken from Sellers. No credit card was recovered, and when he was asked where the credit card was, he said that he didn't know. The police came and took him to the police station where he stood with other persons in a lineup. Meiners identified him and no one else. He wore the same red clothes and low-cut shoes that he had worn since the night before. As a result of a recent gunshot wound he had a scar on his head. He did not know where Larry Forzel or the two women were at the time of trial.

On cross-examination he acknowledged that Forzel, Moss and Miles are still his friends, but admitted that he had not had any contact with Forzel since the day he was arrested. He had last heard that Forzel was in Seattle, Washington, and he had no knowledge of where the other people were. He admitted that although he knew that the young lady he was with was named Virginia, he did not know her last name, had never seen her before or after that night and did not know where she lived.

He acknowledged that he did not know the names of the Sears employees who made the keys for him or sold him the orange juice, and that Kool cigarettes were found on him and Sellers. He admitted that a year or two after the lineup was held he went back to the Sears store and spoke to a Mr. Lockett. He denied telling Lockett that he was with Sellers, but did not know the card Sellers had was hot.

*For the State in rebuttal*
  *Harvey Gentry*
  He testified that prior to arresting Tate he had not had any conversation with him and had no knowledge of any complaint by him regarding the cafeteria.

  *Harold Lockett*
  He is the chief special agent for Sears at 63rd and Halsted. In June 1975 he had a conversation with Ernest Tate in the security office on the second floor. Tate told him that he came into the store with Sellers but did not know the plate Sellers used was hot, and asked him to drop the charges. He told Tate that he could not do that. He had been subpoenaed a week before as a defense witness, had arrived at the trial and talked to the defense attorneys, and was then excused.

  On cross-examination he recalled talking to defense counsel on several occasions, for approximately 20 minutes, and thought that he did talk to them about the statement made to him by Tate. He thought that his conversation with Tate took place in June or July of 1975, but acknowledged that it could have been in 1974. He acknowledged that Tate asked him to drop the deceptive practice charge, which was

dropped. He acknowledged that he did not make any written memorandum of his conversation with Tate. He denied telling the public defender that his conversation with Tate took place three or four months after the incident, and stated that he thought it took place in June 1975, because that is what Harvey Gentry told him.

*For the Defense in rebuttal*
  *Defendant Ernest Tate*

In 1974 he went to the Sears store where he was arrested, saw Lockett, and asked him for the report that no property belonging to Meiners had been taken from him. He could not remember what else he asked him, but there was no conversation about dropping charges because that had already been done. He never told Lockett that he came into the store with Sellers. Lockett tried to get him to incriminate himself and told him that if he would tell him where the credit card was he would let him go. He replied that he didn't know.

On cross-examination, he denied knowing that it was the policy of the State's Attorney not to prosecute misdemeanors once a felony charge is pending or that deceptive practice is a misdemeanor.

OPINION

■■ ■ Defendant first contends that he was not convicted beyond a reasonable doubt. His chief argument in support of this contention is that Richard Meiners' failure to mention to the police that defendant had a scar on his forehead and a mustache, as well as the inaccuracy of Meiners' description of the height of the offenders, casts a substantial doubt upon the credibility of his identification. Meiners did explain at trial that a scar on defendant's forehead would have been concealed by the brim of the hat he was wearing. More importantly, however, the failure to detect the presence or absence of a mustache, or the existence of other slight discrepancies in the description of the accused only affects the weight of the testimony, and does not destroy the credibility of the identification. (*People v. Carroll* (1973), 12 Ill. App. 3d 869, 299 N.E.2d 134, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1144, 94 S. Ct. 3180; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450.) Where, as here, the identification of the witness is positive, precise accuracy in describing facial characteristics is unnecessary. (*People v. Jackson* (1974), 23 Ill. App. 3d 945, 320 N.E.2d 591.) In the instant case, Richard Meiners viewed defendant during the robbery at close range under well-lit conditions. Further, Meiners attended a lineup less than 24 hours after the robbery and there, as well as at trial, positively identified defendant as the man who robbed him. The identification testimony of a single witness, even if it be that of a crime victim, is sufficient to convict if, as here, the

identification is positive and the witness is found to be credible. (*People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.) In light of the above, we conclude that Meiners' identification testimony was sufficiently positive and credible to support the conviction of defendant beyond a reasonable doubt.

■■ We also reject defendant's argument that a reasonable doubt as to guilt was raised by his alibi testimony. We note that this testimony was totally uncorroborated, and specifically, that none of the ·people defendant claimed to have been with at the time of the robbery appeared to testify in his behalf. It is the province of the jury to weigh and balance the identification testimony against the alibi presented by the defense. A determination of guilt by a jury will clearly not be set aside by a reviewing court unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to cause a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) This principle also leads us to reject defendant's argument that a review of the entire case presented by the State discloses various discrepancies which raise a reasonable doubt of guilt. Our review of the record discloses that the positive identification testimony of Richard Meiners and the other corroborative testimony presented by the State provided an ample basis for the decision of the jury that defendant was guilty beyond a reasonable doubt.

■■ Defendant next contends that the trial court erred when it admitted into evidence a statement he allegedly made to a State rebuttal witness, Mr. Lockett of Sears, to the effect that he had come into the Sears store with Mr. Sellers, but did not know that the credit card was stolen. Defendant points out that under Supreme Court Rule 412(a)(ii) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(a)(ii)), the State must disclose to the defense any oral statements made by the accused and a list of witnesses to the making of those statements which the State has within its possession or control. Although defendant concedes that the State did not apparently know of the alleged statement prior to trial, he also cites Rule 415(b)(Ill. Rev. Stat. 1975, ch. 110A, par. 415(b)) which imposes a continuing duty upon the State to disclose information discovered during trial. Defendant argues that because the State did not meet its duty to disclose, but simply cross-examined defendant as to the statement and then elicited it from Mr. Lockett on rebuttal, the discovery rules were violated and the admission of the statement into evidence was reversible error. We disagree. The purpose of the discovery rules is to promote the fact-finding process and protect the accused against surprise, unfairness and inadequate preparation. (*People v. O'Connell* (1964), 30 Ill. 2d 603, 198 N.E.2d 834; *People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274.) The record here reveals that Lockett was originally subpoenaed by

the defense, came to the trial court pursuant to the subpoena, and had several conversations with the defense attorneys. On cross-examination Lockett indicated that during one of his conversations with defense counsel he told them of the statement he testified to. Although defense counsel took steps to disprove that assertion, we cannot conclude that by the admission of Lockett's testimony into evidence defendant was improperly prejudiced or unprotected from surprise, unfairness and inadequate preparation. See *People v. Field* (1973), 13 Ill. App. 3d 74, 299 N.E.2d 754.

■■ ■ Closely related to the above argument is defendant's contention that one of his defense attorneys should have been allowed to withdraw as counsel in order to testify and rebut Lockett's assertion that he had told defense counsel of defendant's statement. Defendant argues that the trial court erred when it did not allow defense counsel to so testify, and that this error was compounded by a State's attorney's remark during closing argument. Regarding the first contention, it is clear that the trial court has wide discretion in refusing to permit attorneys to testify at a trial wherein they also serve as advocates. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E. 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179.) Our supreme court has held that this is especially true where there are other witnesses available to testify. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) In the instant case defense counsel, after extensively cross-examining Lockett, called defendant to testify in rebuttal that he had never made the statement which Lockett testified to. The matter was thereby placed in issue for the jury to decide, and the trial court's decision not to allow defense counsel to testify was not an abuse of discretion. The portion of the closing argument which defendant cites as harmful occurred after defense counsel asserted to the jury that the State's rebuttal witness lied about what he had told him. The State's attorney's objection to the statement, which was sustained, was based on the grounds that "counsel putting himself in the place of a witness is unethical." Although defendant cites this remark on appeal, he failed to make any objection to it when it was made, and any error is therefore deemed waived. (*People v. Edwards* (1973), 55 Ill. 2d 25, 302 N.E.2d 306, *cert. denied* (1974), 415 U.S. 928, 39 L. Ed. 2d 486, 94 S. Ct. 1438.) Moreover, the remark concerning the defense attorney's conduct does not appear to have prejudiced defendant, and certainly does not rise to the level of repeated harmful conduct that defendant cites as meriting reversal. *Cf. People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19.

■■■ Defendant also contends that the court erred in allowing the State to make repeated references to his prior arrests, thereby denying him a fair trial. In the first such instance that defendant cites, however, the State's attorney made no mention of a prior arrest, but asked if

defendant's fingerprint, used for a comparison with one lifted from the scene of the crime, was taken on a certain date. Defense counsel nevertheless objected immediately. The court sustained the objection and instructed the jury to disregard the exchange. Even if error was found, therefore, the instruction would appear to have cured any prejudice which resulted. (See *People v. Johnson* (1973), 11 Ill. App. 3d 745, 297 N.E.2d 683.) In a second instance cited by defendant, the State's Attorney again made no reference to a prior arrest. Defendant has not shown how the questions he cites were prejudicial, and on review, they appear to have been proper responses to defendant's assertion on direct examination that misdemeanor charges against him were dropped and that he was not familiar with the courts. In the remaining instance cited by defendant, the State's Attorney cross-examined him as follows:

"Q. It's the State's Attorney who drops the charge at the lower courts, isn't it, Mr. Tate?

A. I don't know.

DEFENSE COUNSEL: Objection.

A. I am not familiar with courts.

Q. It's the man who prosecutes you, isn't it?

A. I don't know that either. I haven't been in trouble that much.

Q. That much?

A. Except for misdemeanor and what not. I don't run the court.

Q. You have never been arrested for robbery, robbery before this?

A. I was arrested and the case was dropped.

DEFENSE COUNSEL: Objection.

THE COURT: Sustained."

Testimony concerning another offense is generally considered to be sufficiently prejudicial so that, where such testimony has no value except to create an inference that the accused has committed the current crime, the testimony of the other offense should not be admitted into evidence. (*People v. Butler* (1971), 133 Ill. App. 2d 299, 273 N.E.2d 37.) Even when evidence of other offenses is relevant and material to such issues as intent or identity, its probative value must be balanced against the prejudicial effect its disclosure may have upon the jury. (*People v. Sievers* (1978), 56 Ill. App. 3d 880, 886, 372 N.E.2d 705, 709 (Craven, J., dissenting); *People v. Pelate* (1977), 49 Ill. App. 3d 11, 363 N.E.2d 860.) The State has not demonstrated here that the reference to a prior arrest for robbery had sufficient probative value to warrant its admission. At defendant's trial for armed robbery, the potential of the reference to improperly suggest to the jury that defendant had committed the offense charged leads us to conclude that its admission into evidence was indeed error. We note, however, that the quoted exchange was the only such reference made by

the State, and that the court, while sustaining defendant's objection, specifically declined to instruct the jury to disregard the reference in order to avoid undue emphasis of the subject. It is not our policy to reverse a criminal conviction merely because an error has been committed, unless it appears that real justice has been denied or that the jury's verdict may have resulted from such error. (*People v. Clark* (1976), 41 Ill. App. 3d 419, 354 N.E.2d 134.) Our review of the record, as we have previously indicated, shows that defendant's guilt was established beyond any reasonable doubt. Because it does not appear that the error complained of contributed to that finding of guilt, that error was harmless and does not warrant reversal.

■■ ■ Defendant's remaining contentions include the argument that because sufficient evidence linking and making him accountable for Sellers was not adduced, any testimony or argument regarding Sellers was erroneously admitted. We reject this argument. The test of admissibility of evidence is whether it fairly tends to prove the particular offense charged and any circumstances may be put in evidence which tend to make the proposition at issue either more or less probable. (*People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) According to the evidence adduced, defendant was present at Sears with Sellers, who apparently tried to make a purchase with a credit card belonging to Richard Meiners, less than 12 hours after Meiners was robbed of his wallet and credit cards by defendant and another individual. Under these circumstances, the evidence clearly had probative value to the offense charged and was properly admitted for the jury's consideration. Defendant also contends that the court improperly restricted his examination and argument as to Officer William Murray's interest, bias or prejudice, and improperly allowed testimony and argument concerning the "policy" Sears has for dealing with stolen credit cards. A review of the record shows, however, that neither of these issues was ever mentioned in defendant's written motion for a new trial. We will therefore follow the well established rule that the failure to specify alleged errors in a motion for a new trial constitute a waiver of those issues, and they cannot then be urged as grounds for reversal on review. (*People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.) Moreover, we note that in this case there is neither a close balance of the evidence nor any obvious instance of prejudice which would merit departure from the general waiver rule. See *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

■■ Finally, defendant contends that the trial court erred when it imposed sentence prior to the disposition of his post-trial motions. Defendant's sole support for this argument is *People v. Carnes* (1975), 30

Ill. App. 3d 1030, 332 N.E.2d 674, in which a guilty verdict was returned, post-trial motions were filed, and sentence was imposed. Although defendant's post-trial motions were then amended, to additionally contend that the sentence was excessive and probation should have been granted, no action was taken on them by the court and no notice of appeal was filed. Some eight months after defendant had begun serving his sentence his motions were finally denied, and over a year later he moved for leave to file a late notice of appeal. The fourth district of this court denied that motion. The court found, however, that the trial court, by virtue of its delay in ruling on the post-trial motions, had lost the jurisdiction needed to vacate the sentence, set aside the conviction or grant a new trial. The court ruled that because the trial court's delay and resulting loss of jurisdiction effectively precluded defendant from prosecuting a direct appeal, fundamental fairness required that the case be reversed and remanded for a new trial. In light of the facts of the instant case, defendant's reliance on *Carnes* is misplaced. Defendant was found guilty of armed robbery on January 12, 1976, and within the 30-day period properly filed his notice of appeal. Although defendant argues that it was error here, as in *Carnes*, "for the court to delay disposition of defendant's post-trial motions until after sentencing," the record shows that it was defendant who requested several extensions, and first filed his motions on December 1, 1976. The trial court entered its order denying those motions on the same day, and defendant filed a notice of appeal. We conclude that unlike the situation in *Carnes* the trial court cannot be charged with any delay which prejudiced defendant or precluded him from prosecuting a direct appeal.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.