THE PEOPLE *ex rel.* TYRONE C. FAHNER, Attorney General, Plaintiff-Appellee, *v.* COLORADO CITY LOT OWNERS AND TAXPAYERS ASSOCIATION *et al.*, Defendants.—(MARK P. BINSTEIN, Defendant-Appellant.)

First District (4th Division)   No. 81—1218

Opinion filed July 22, 1982.—Rehearing denied August 25, 1982.

Stephen J. Spitz, of Sperling, Slater & Spitz, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Kathleen Hogan Morrison, Assistant Attorney General, of Chicago, of counsel), for appellee.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Mark P. Binstein, appeals the decision of the trial court holding him in contempt of court for violation of a consent decree and fining him $4,500. He raises the following issues for review: (1) whether his activities constituted contempt; (2) whether the trial court erred in finding that he could not purge himself of contempt; (3) whether plaintiff's conduct constituted estoppel or waiver of its rights under the consent decree; and (4) whether plaintiff's conduct constituted bad faith, thus, precluding a finding of contempt.

We affirm and modify.

On December 20, 1978, the Illinois Attorney General filed a complaint for injunctive and other relief against the Colorado City Lot Owners and Taxpayers Association (Colorado City Lot Owners), Myron R. Luchshyn and Mark P. Binstein under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 261 et seq.). On February 2, 1979, a consent decree was entered between the Attorney General and Binstein. Findings in the decree were as follows:

> (1) Binstein advertised, solicited and enrolled property owners of land located in Colorado City, Colorado, residing in the Chicago area, for the purpose of conducting litigation against Great Western Cities, the owner and developer of Colorado City;
>
> (2) On November 22, 1978, Binstein mailed a "Notice of Urgent Meeting" to about 3,000 Chicago area lot owners;

(3) At a November 30, 1978, meeting, Binstein represented to lot owners that he had won large sums of money from land developers in similar circumstances when in fact those cases were still pending;

(4) Binstein represented himself to be a land sales and land fraud expert when in fact he specialized in organizing lawsuits against land developers; in 1971 he had been fined $1,000 for violating Federal securities laws;

(5) Binstein represented that large sums of money were necessary for research and legal fees, and that he received only a consultation fee when in fact he had been accused in Indiana of misappropriating most of the funds collected and not paying the attorneys retained by the lot owners' association;

(6) Binstein represented to lot owners that he performed valuable research into alleged land sale frauds of Great Western Cities, but it has not been proved whether his research has value in proving such frauds;

(7) Binstein claimed that he had negotiated with the Chicago Bar Association and various law firms to represent the lot owners, but in fact no representation agreements had been completed and no local attorneys retained;

(8) Binstein represented that past actions have been very successful when in fact no actions have been concluded and no money has been refunded to lot owners;

(9) Binstein represented that no other avenue of recovery was open to lot owners except to join the association organized by Binstein;

(10) Binstein failed to disclose that in June 1978 he executed a stipulation amounting to an assurance of voluntary compliance preventing him from soliciting funds in Wisconsin as agent for lot owners;

(11) Binstein imparts a sense of urgency when none may be necessary since most owners purchased their lots around 1970.

The decree provided the following:

(1) Binstein was permanently injoined from controlling the management, affairs and conduct of Colorado City Lot Owners;

(2) Binstein was permanently enjoined from organizing any business entity for the purpose of soliciting litigants for a lawsuit against Great Western Cities or any other business entity without entering into an assurance of voluntary compliance with the Attorney General;

(3) Binstein was permanently enjoined from any organizational

role in a lot owners' association "where he might solicit, collect, negotiate, disburse, or deposit funds," on behalf of a lot owners' association "as opposed to his acting as an agent or employee of that entity";

(4) Binstein was enjoined from taking any action of any nature whatsoever relating to any Colorado City Lot Owners' funds.

On January 30, 1981, the Attorney General filed a petition for a rule to show cause why Binstein should not be held in contempt of court and a petition for emergency supplemental relief. The first petition alleged that Binstein violated the terms of the February 2, 1979, consent decree by the following acts:

(1) The Rotonda Lot Purchasers Association mailed a letter to Illinois residents who owned lots in Rotonda subdivisions in Florida. According to the letter:

(a) Lot owners were urged to attend a meeting on January 24, 1981;

(b) Lot owners were victims of a massive land fraud scheme perpetrated by the Rotonda developer, Cavanagh Communities;

(c) The Rotonda association was formed to start litigation based on exhaustive research by a research service;

(d) The association had retained the investigator responsible for research in other successful lawsuits against fraudulent land developers.

(2) The lawsuits described in the letter involved Colorado City and Cochiti Lake developments, and the investigator was defendant Binstein.

(3) On January 24, 1981, Binstein represented the Rotonda association at the meeting and solicited funds to start litigation. Lot owners were given a document called "Cavanagh Communities and Its Rotonda Subdivisions - A Report Prepared by Mark P. Binstein 'Interstate Land Sales Research.' "

(4) Lot owners also received a "Recovery Action" which informed them that Binstein had been retained to conduct research and investigation and participate in legal proceedings as directed by the association and its law firms and which also solicited funds.

(5) Binstein did not enter into an assurance of voluntary compliance with the Attorney General before engaging in the conduct described above.

The Attorney General prayed that Binstein be held in contempt and restrained from attending meetings, soliciting and collecting funds,

and from further dealings with the Rotonda association.

At a hearing on January 30, 1981, the court stated:

"THE COURT: The State of Illinois cannot take the position that they will not negotiate with Mr. Binstein to secure an assurance of voluntary compliance. And on the other hand, Mr. Binstein cannot take the position that he unilaterally, without the protection of the Court can engage in conduct contrary to the consent decree which he entered into, deciding for himself that the State's conduct is improper.

So, gentleman [sic], there is no equity on either side. As of this date, I'd urge both parties to engage in negotiations that are necessary to develop the assurance of voluntary compliance.

I'm not unwilling to foreclose Mr. Binstein from participating in his February 1 meeting because that activity is surely precluded by the consent decree until such time as an assurance of voluntary compliance is obtained. I believe it was incumbent upon Mr. Binstein to refrain from any Illinois conduct until he had indeed secured the assurance of voluntary compliance from the Attorney General or until he had secured relief from the Court under this consent decree that that assurance was being denied him unreasonably.

He didn't take any action, so his rights in Illinois are still dictated by the consent decree and that is that he shall not engage in activities in Illinois without this assurance.

MR. SPITZ [defense attorney]: Do I understand that we're to attempt to reach an agreement this afternoon.

THE COURT: Yes.

MR. SPITZ: If possible.

THE COURT: That's correct."

At the conclusion of the hearing, the court ordered that if Binstein appeared at meetings of the Rotonda association, his remarks must be limited to the Rotonda investigation and no funds could be solicited or collected. Funds could be solicited and collected in his absence. The Attorney General was directed to begin negotiations on the assurance of voluntary compliance.

On February 6, 1981, Binstein filed a purported assurance of voluntary compliance to which the Attorney General objected because he (the Attorney General) did not sign it and because its terms were not acceptable. On February 11, 1981, Binstein moved to dismiss the contempt petition on a theory of unclean hands. The trial court denied this motion and ordered defendant to answer the petition.

On February 1981, Binstein made several motions involving discovery which were opposed by the Attorney General. The trial court quashed Binstein's notices to depose William P. Oberhardt, an assistant Attorney General, and Tyrone C. Fahner, the Illinois Attorney General, and ordered defendant to make no further attempts to seek discovery from them.

On February 13, 1981, the contempt hearing began. The trial court defined the issues as "whether or not Mr. Binstein's conduct was in violation of the consent decree" and "whether or not the Attorney General is withholding a reasonable attempt to negotiate a reasonable assurance of voluntary compliance."

Testimony at the hearing established the following.

Plaintiff called Mark Binstein as an adverse witness. Binstein testified that he signed assurances of voluntary compliance for Colorado City Lot Owners and the Cochiti Lake association. At the time of the contempt proceeding, he was employed by the Rotonda association and had signed an employment contract in January 1981. In March or April 1980, Binstein began to research for Rotonda lot owners and spent about half his time on this investigation until November 1980. Then Binstein presented his initial report and began to meet with Rotonda owners every week. The formation of the Rotonda Lot Purchasers Association was discussed at some of these meetings.

Binstein helped draft letters to Rotonda lot owners informing them of meetings on January 24 and February 1, 1981. In December 1980, he prepared a recovery action letter which included the following provision: "The Association met with the Illinois Attorney General and provided full disclosure of all plans, proposed actions, this Recovery Action, and Association agreements with law firms, investigator, accountant and others." This letter was given to lot owners who attended the meeting on January 24, 1981.

Binstein stated that he met with Darek Gilna, an assistant Attorney General, at least 20 times between the signing of the consent decree in February 1980 and November 1980. Binstein claimed that he telephoned William Oberhardt, Gilna's replacement, twice in November or December 1980, but his calls were not returned. On January 8, 1981, Binstein delivered to Oberhardt's office a cover letter and documents concerning Binstein and the Rotonda association. At the time of trial, Binstein had rejected the Attorney General's proposed assurance of voluntary compliance as false and defamatory.

Four Rotonda lot owners testified for the People. John Otten, former president of the Rotonda association, attended meetings in November and December 1980. On January 3 or 13, 1981, the associa-

tion was incorporated and Binstein was hired. Willis Young, Robert Szyka and Stanley Gordon went to the January 24, 1981 meeting. About 500 or 600 persons attended that meeting which lasted from about 1:30 to 5:30 p.m. Binstein spoke most of the time, discussing his investigative report on Rotonda, litigation against other developers, and membership dues.

Derek Gilna was employed as an assistant Attorney General in the Consumer Protection Division of the office of the Attorney General from April 1978 to mid-December 1980. He helped prepare the consent decree and the Cochiti Lake assurance of voluntary compliance. On December 15 or 16, 1980, Binstein telephoned Gilna on an unrelated matter and the latter told Binstein that he was leaving the Attorney General's office immediately to enter private practice. Binstein said that he was involved with another real estate developer. Gilna had no other conversations about a proposed assurance of voluntary compliance and was unaware of a November meeting of Rotonda lot owners.

The plaintiff rested and Binstein called John Bowlus, the attorney for the Colorado City Lot Owners. Bowlus stated that although Binstein "is probably given to hyperbole," the actual land fraud is worse than the allegations in his report. In Bowlus' opinion, Binstein was one of the foremost experts in the area of land fraud, totally reliable, dependable and completely honest. After Bowlus' testimony, the hearing was adjourned.

When the trial resumed on March 5, 1981, officers of the Colorado City Lot Owners association, Agnes Kelly, Thomas J. Meegan and Marlene Rosecranz, testified as to Binstein's good character. Leonard Pierce attended the Rotonda meetings and stopped payment on a membership check when he heard televised remarks by the Attorney General. Pierce later rejoined the association.

Sharon Tucker, a litigation assistant for the Attorney General's office, testified that she received about five complaints against Binstein from Cochiti Lake owners and five from Rotonda owners.

Binstein then testified in his own behalf. He tried to introduce a videotape in which Attorney General Fahner made remarks about him. The trial court stated: "I have previously placed on the record in this case my dismay at Mr. Fahner's TV appearance and his own media statements. They are, however, not relevant to the record before us today, and the video tape will not be shown for the court."

Binstein stated that he had a telephone conversation with his defense lawyer, Stephen Spitz, on January 8, 1981. Spitz told him that he had talked to assistant Attorney General Oberhardt. Binstein of-

fered to prove the substance of these conversations in order to show Oberhardt's indifference to obtaining an assurance of voluntary compliance.

Charles Perlman, an attorney, testified that he had discussions with Binstein and attorney Spitz in early January 1981 about a possible meeting with the Attorney General's office on an assurance of voluntary compliance.

After closing arguments, the trial court stated:

"From the testimony presented here, it's clear that Mark P. Binstein was in violation of the consent decree when he met with Mr. Otten, Mr. Langtry, and other Rotonda lot owners in November 1980, when he participated in weekly meetings which led to the organization of the association in November, December, and January; when he drafted for and on behalf of the association the notice of meeting letter and the recovery action document for the association; and when he conducted as agent or employee of the association the January 24, 1981, Hillside, Illinois meeting. He was at that time an employee or an agent of the association and was by that conduct required to have previously secured an assurance of voluntary compliance. To suggest that this array of conduct is not prohibited under the consent decree is to deny the clear meaning of the terms of the consent decree.

Mr. Binstein may not, as he has done here, first embark upon prohibited activities and attempt to get an assurance later. Having previously secured assurances from the Attorney General, Mr. Binstein is not unfamiliar with the procedure. Chronology of events is everything, if Mr. Binstein is to be engaged in any Illinois activities. Illinois contacts are not to be made until after the assurance is secured. That is the deal Mr. Binstein made with Illinois, and that is the deal the Attorney General here seeks to compel him to abide by.

If the procedure in securing a needed assurance gets bogged down or demands are made which Mr. Binstein questions, his resort is to the Court for relief or interpretation. He cannot, as he did here, take matters into his own hands and embark upon prohibited activities. He agreed not to do so. And when he does so, he flirts with contempt.

His filing of a unilateral assurance in this court on February 6th does not comply with the terms of the consent decree. It does not explain away or justify his earlier conduct of November, December, and January, and does not bind the Attorney

General. Violation of the consent decree is tantamount to contempt of Court and will not be lightly countenanced by this Court enforcing the decree of Judge Nathan Cohen.

The consent decree protects Mr. Binstein from an arbitrary or unreasonable demand by the Attorney General. With judicial guidelines available as to the interpretation and construction of the consent decree, there is virtually no excuse for disregard of its clear terms. It should be clearly understood that the consent decree here being enforced was negotiated for by Mr. Binstein, was agreed to and signed by Mr. Binstein, was the basis upon which pending case action against Mr. Binstein was terminated and had previously been adhered to by Mr. Binstein in his earlier Illinois dealings regarding Cochiti Lake property owners.

In short, Mr. Binstein is no stranger to the terms of the consent decree. For all of these reasons, I find from all of the evidence and testimony presented and considered that the Respondent, Mr. Mark P. Binstein, has since November 1980 and through January 24, 1981, been engaged in a course of conduct within Illinois in violation of the consent decree of February 2, 1979. The totality of his conduct reflects an awareness of his activities under that decree and a conscious and calculated disregard of those responsibilities as to amount to contempt of Court.

I find the Respondent, Mark P. Binstein, guilty of civil and direct[1] contempt of Court, contempt of the order which he had voluntarily assented to and which was entered by Judge Cohen on February 2, 1979."

On March 24, 1981, the trial court fined Binstein $4,500, stating: "It's my judgment that any lesser sanction would deprecate the seriousness of the respondent's actions and would not serve the ends of justice." On April 22, 1981, the trial court denied Binstein's motion to reconsider and vacate the sanction and contempt. Binstein appealed and his motion to stay enforcement of the fine pending appeal was granted.

The first issue raised by defendant Binstein is whether his activities constituted contempt. Defendant argues that his activities did not violate the consent decree because that decree did not prohibit Illinois contacts. Binstein contends that he could do anything in Illinois ex-

---

[1]Since extrinsic evidence was required to establish the allegedly contemptuous conduct of Binstein, the contempt was indirect rather than direct. See *United States v. Wilson* (1975), 421 U.S. 309, 44 L. Ed. 2d 186, 95 S. Ct. 1802; *People v. Javaras* (1972), 51 Ill. 2d 296, 281 N.E.2d 670; *People v. Jashunsky* (1972), 51 Ill. 2d 220, 282 N.E.2d 1.

cept organize an entity without an assurance of voluntary compliance, that he organized no entities, and that the Attorney General did not prove nor did the court find that defendant organized a business entity.

A consent judgment is generally regarded as one entered by a court reciting a settlement agreement reached as an independent undertaking by the parties which may supercede pleadings and evidence and limit the relief to be granted. (*Lubowsky v. Skokie Valley Community Hospital* (1979), 79 Ill. App. 3d 909, 913, 398 N.E.2d 1037, 1040.) Like any other agreement, the law of contract controls its interpretation and its meaning should be determined by the language chosen by the parties. (*Clark v. Standard Life & Accident Insurance Co.* (1979), 68 Ill. App. 3d 977, 983, 386 N.E.2d 890, 896.) Thus, a consent decree should be enforced as written, is conclusive upon the parties and cannot be varied without the consent of each party. *Dunaway v. Storm* (1975), 30 Ill. App. 3d 880, 884, 334 N.E.2d 825, 829.

The consent decree required Binstein to enter into an assurance of voluntary compliance with the Attorney General of Illinois before he either (1) organized an entity to solicit litigants for a lawsuit or (2) acted as an employee or agent for an entity which solicits litigants for a lawsuit. The trial court found that defendant violated the consent decree by participating in the weekly meetings of Rotonda lot owners which led to the organization of the association, by drafting a notice of meeting letter and the recovery action document for the association, and by conducting the meeting on January 24, 1981. Thus, defendant organized and acted as an employee or agent for an entity which solicits litigants for a lawsuit without first entering into an assurance of voluntary compliance with the Attorney General. Binstein's only contact with the Attorney General consisted in dropping off documents with a secretary in January 1981. As the trial court stated, "[t]o suggest that this array of conduct is not prohibited under the consent decree is to deny the clear meaning of the terms of the consent decree."

A finding of willful contempt is a matter of fact to be determined by the trial court and it will not be disturbed on review unless there is a clear abuse of discretion. (*Frank B. Hall & Co. v. Payseur* (1981), 99 Ill. App. 3d 857, 860, 425 N.E.2d 1002, 1005.) We find no abuse of discretion, and based on the record before us we hold that the trial court properly found that defendant's activities in violating the consent decree constituted contempt.

The second issue raised by defendant is whether the trial court erred in finding that defendant could not purge himself of contempt. Defendant urges that his contempt was civil, that the contempt was

purged when he entered into an assurance of voluntary compliance, and that no sanction was justified.

■■ Contempt proceedings, while usually called civil or criminal, are, strictly speaking, neither. They may best be characterized as *sui generis* and may partake of the characteristics of both. (*People ex rel. Chicago Bar Association v. Barasch* (1961), 21 Ill. 2d 407, 409, 173 N.E.2d 417, 418.) Proceedings in the nature of civil contempt ordinarily are prosecuted to enforce the rights of private parties and to compel obedience to orders or decrees for the benefit of opposing parties. (*47th & State Currency Exchange, Inc. v. B. Coleman Corp.* (1977), 56 Ill. App. 3d 229, 233, 371 N.E.2d 294, 297-98.) Proceedings in the nature of criminal contempt are directed to the preservation of the dignity and authority of the court, or a judge acting judicially. (*47th & State Currency Exchange Inc. v. B. Coleman Corp.* (1977), 56 Ill. App. 3d 229, 233.) A sanction for civil contempt is coercive in nature and is instituted to compel obedience to a court order. The contemnor can avoid the sanction by compliance with the order. The sanction invoked, such as incarceration, will continue in effect until there is compliance or termination of the sanction by the terms of the order itself. (*In re Estate of Shlensky* (1977), 49 Ill. App. 3d 885, 891-92, 364 N.E.2d 430, 435.) A sanction for criminal contempt is punitive in nature and is instituted to punish, as opposed to coerce, a contemnor for contumacious conduct. *In re Estate of Shlensky* (1977), 49 Ill. App. 3d 885, 891.

■■ In a civil contempt proceeding, the contemnor is given the opportunity to purge himself of the contempt. (*Continental Illinois National Bank v. Brach* (1979), 71 Ill. App. 3d 789, 792-93, 390 N.E.2d 373, 376.) In the instant case, the contempt sanction was punitive and, thus, criminal in nature and represented the trial court's determination that Binstein was being punished for his failure to abide by the terms of the consent decree. The trial court, based on the evidence presented to it, could reasonably conclude that Binstein was in contempt and that a punitive measure should be invoked.

However, the fine of $4,500 must be reduced under the holding of *County of McLean v. Kickapoo Creek, Inc.* (1972), 51 Ill. 2d 353, 282 N.E.2d 720. In that case, our supreme court held that in all cases of criminal contempt the trial court's refusal to honor defendant's demand for a jury trial or its failure to sufficiently inquire whether defendant wished to waive this right will limit the maximum penalty which may be imposed upon conviction to incarceration for a period of 6 months or less and limit any find to a maximum of $500. (51 Ill. 2d 353, 356.) Only in those circumstances where the penalty actually im-

posed exceeds 6 months incarceration or a fine in excess of $500 must the record reflect that defendant was afforded a jury trial or knowingly and understandingly waived his right in open court. 51 Ill. 2d 353, 356.

An examination of the record reveals that the trial court did not inquire whether the defendant wished to waive his right to a jury trial in the contempt proceedings, and that his defense counsel did not expressly state that a jury trial was waived. We conclude, therefore, that under *County of McLean v. Kickapoo Creek, Inc.*, defendant's fine must be reduced to $500 because he did not knowingly waive the right to a jury trial.

The next issues raised by defendant involve his defenses to a finding of contempt. Defendant claims that the trial court erred in not upholding his affirmative defense of waiver and estoppel and bad faith. In support of his defense of waiver and estoppel, defendant contends the Attorney General encouraged contacts by Binstein with Cochiti Lake lot owners without an assurance of voluntary compliance. Binstein claims that he relied on this encouragement and that he was not informed that the Attorney General had taken the new position of no Illinois contacts with any lot owners without an assurance. In support of his defense of bad faith, defendant contends that the Attorney General was trying to drive him out of the State of Illinois.

According to defendant, he could not prove these defenses because the trial court denied his motions for discovery and section 60 notices and because it refused to allow the admission of certain hearsay evidence. Defendant attempted to depose the prosecutor, assistant Attorney General Oberhardt, to procure admissions from him and to call him as an adverse witness. Defendant also tried to depose and call as an adverse witness the Attorney General. the trial court has wide discretion in refusing to permit attorneys to testify at a trial wherein they also serve as advocates. (*People v. Tate* (1978), 64 Ill. App. 3d 1, 10, 380 N.E.2d 976, 983.) It is a proper exercise of judicial discretion to refuse to allow a defendant to call a prosecuting attorney as a defense witness. (*People v. Gendron* (1968), 41 Ill. 2d 351, 358, 243 N.E.2d 208, 213.) We have examined the record and find no abuse of discretion in the trial court's denial of defendant's motions for discovery. We hold that the trial court properly denied defendant's attempts to depose and call as witnesses Fahner and Oberhardt.

Defendant attempted to introduce into evidence a videotape of televised remarks by Fahner which purported to show the latter's intent to drive Binstein out of the State. The trial court refused to let defendant play the videotape because Fahner's remarks, made after

the dates with which the contempt proceedings were concerned, were irrelevant. Evidence, in order to be relevant, must have a reasonable tendency to prove some material fact in issue. (*Pitrowski v. New York, Chicago & St. Louis R.R. Co.* (1955), 6 Ill. App. 2d 495, 499, 128 N.E.2d 577, 578.) We hold that the trial court properly refused to admit into evidence the televised remarks of the Attorney General.

Defendant also attempted to introduce into evidence a conversation between himself and his defense attorney, Stephen Spitz, in which the latter repeated purported conversations with the prosecuting attorney, William Oberhardt. These conversations were inadmissible as hearsay, an out-of-court declaration offered as proof of the matter asserted. (*Simon v. Plotkin* (1977), 50 Ill. App. 3d 603, 607, 365 N.E.2d 1022, 1025.) We hold that the trial court properly refused to admit into evidence defendant's telephone conversation.

We reject defendant's arguments of waiver and estoppel and bad faith. A waiver is the intentional relinquishment of a known right. (*Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 461, 323 N.E.2d 521, 529.) Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might otherwise have existed as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse and who on his part acquires some corresponding right. (*Johnson v. Johnson* (1975), 26 Ill. App. 3d 64, 67, 324 N.E.2d 450, 452.) Estoppel against the public is little favored, is found only in rare and unusual circumstances and will not be applied to defeat the effective operation of a policy adopted to protect the public. *County of Cook v. Patka* (1980), 85 Ill. App. 3d 5, 12-13, 405 N.E.2d 1376, 1381.

We have examined the record in this case and find no support for defendant's contentions that the Attorney General acted in bad faith, waived the right to enforce the consent decree and is, therefore, estopped from prosecuting defendant for violation of its terms. As the trial court stated, "[i]f the procedure in securing a needed assurance gets bogged down or demands are made which Mr. Binstein questions, his resort is to the Court for relief or interpretation. He cannot *** take matters into his own hands ***."

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed, but the $4,500 find is reduced to $500.

Affirmed as modified.

LINN and ROMITI, JJ., concur.